**WALTER O. BOSWELL MEMORIAL HOSPITAL, et al., Plaintiffs,**

v.

**Margaret M. HECKLER, Secretary of the Department of Health and Human Services, et al., Defendants.**

Civ. A. Nos. 82–0710, 82–3259 and 83–1903.

United States District Court, District of Columbia.

Sept. 27, 1983.

---

Ronald N. Sutter, Powers, Pyles, Sutter & O'Hare, Washington, D.C., Robert Klein, Weissburg & Aronson, Inc., Los Angeles, Cal., for plaintiffs.

Jeanne Schulte Scott, Dept. of Health & Human Services, Royce C. Lamberth and Ellen Lee Park, Asst. U.S. Attys., Washington, D.C., for defendants.

## MEMORANDUM OPINION

BRYANT, District Judge.

In these actions plaintiffs contend that a regulation promulgated by the Secretary of the Department of Health and Human Services which changes the method of governmental reimbursement for expenses incurred for medical malpractice insurance is violative of both the Administrative Procedure Act and the Medicare Act, and seek to enjoin its enforcement. Inasmuch as plaintiffs attack the regulation on the same grounds and seek identical relief, the cases have been consolidated for trial; and they are presently before the court on cross-motions for summary judgment. For the reasons stated below, the court grants the defendants' motions. Plaintiffs' motions are denied.

*Background*

Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (the Medicare Act) in 1965 to provide comprehensive health insurance for the aged. Part A covers hospital and some post-hospitalization expenses. 42 U.S.C. §§ 1395c–1395i. Part B provides insurance for physicians' services and other non-hospital or outpatient expenses. 42 U.S.C. §§ 1395j–1395w.

Hospitals which qualify as providers of services are reimbursed for all reasonable and necessary costs, both direct and indirect, incurred in furnishing services to Medicare beneficiaries. 42 U.S.C. § 1395cc. These costs may not be shifted to non-Medicare patients, but the Secretary is only required to pay those expenses which are both reasonable and necessary for care. 42 U.S.C. § 1395x(v)(1)(A). If the reasonable cost is lower than the customary charge, the government will reimburse the lower of the two. 42 U.S.C. § 1395f(b). Any hospital dissatisfied with a reimbursement determination may appeal to the Provider Reimbursement Review Board (PRRB). The PRRB resolves factual disputes between providers and the government regarding the reimbursable nature of specific costs incurred by the provider. 42 U.S.C. § 1395oo (a). A provider may seek judicial review of any final decision of the PRRB (reversed or modified by the Secretary) or of the Board's determination that it lacks authority to decide the appeal. 42 U.S.C. § 1395oo (f)(1).

On March 15, 1979, the Secretary published a notice of proposed rulemaking (NPRM), indicating an intention to discontinue the utilization rate reimbursement method for malpractice insurance costs. The proposed amendment sought to directly apportion reimbursement "based on Medicare malpractice loss experience, instead of the current apportionment basis of Medicare's overall utilization of provider services." 44 Fed.Reg. 15744–15745.

The NPRM, in a section entitled "Supplementary Information", explained that, under the regulation then in effect, the government was reimbursing "a disproportionate amount of malpractice costs." The support offered for this finding was "a study conducted by an HEW consultant"

which found that "malpractice awards for Medicare and Medicaid patients are significantly lower in amount than losses for other patient populations." 44 Fed.Reg. 15745. The proposed rule also provided that, absent a paid claims history, the provider would be reimbursed according to "an actuarial estimate of Medicare's share of these current malpractice costs." Id.

The NPRM did not mention any specific national ratio figure resembling the final 5.1% of malpractice costs published in the final rulemaking. The NPRM did state that alternative methods to an "actuarial estimate of Medicare's share of these current malpractice costs" could be used, including "a national ratio of Medicare malpractice paid losses to total malpractice paid losses as opposed to a single provider's malpractice loss experience." Id.

The contested rule, 42 C.F.R. § 405.-452(b)(1)(ii) (the Malpractice Rule) which was promulgated on June 1, 1979, effective for cost reporting periods beginning after June 30, 1979, drastically alters the former method used by the government to reimburse the costs of malpractice insurance. Before June 1979, malpractice insurance premiums were considered part of the general indirect costs of providing medical care. The cost of malpractice insurance premiums was accumulated, along with all other general and administrative (G & A) costs, in a "cost center." 42 C.F.R. § 405.-453. The government reimbursed these G & A costs, along with the reimbursable costs accumulated in other cost centers, according to the utilization rate of Medicare patients in the hospital, that is, the percent of Medicare patients using the services of the cost center.

The Malpractice Rule[1] removes malpractice insurance costs from the G & A

---

1. The Malpractice Rule provides:
 For cost reporting periods beginning on or after July 1, 1979, costs of malpractice insurance premiums and self-insurance fund contributions ·must be separately accumulated and directly apportioned to Medicare. The apportionment must be based on the dollar ratio of the provider's Medicare paid malpractice losses to its total paid malpractice

losses for the current cost reporting period and the preceding 4-year period. If a provider has no malpractice loss experience for the 5-year period the costs of malpractice insurance premiums or self-insurance fund contributions must be apportioned to Medicare based on the national ratio of malpractice awards paid to Medicare beneficiaries to malpractice awards paid to all patients. The

cost centers, reimbursing malpractice costs "based on the dollar ratio of the provider's Medicare paid malpractice losses for the current cost reporting period and the preceding four-year period." 42 C.F.R. § 405.-452(b)(1)(ii). If a provider has experienced no Medicare malpractice losses for the relevant five-year period, the reimbursement is made according to the "national ratio" of malpractice awards paid to Medicare patients to such awards paid to all patients. The Secretary's current calculation of this ratio is 5.1%.

The plaintiffs, Boswell Memorial Hospital, et al., brought an appeal to the Provider Reimbursement Review Board (PRRB), contesting, among other matters, the government's failure to reimburse the cost of medical malpractice insurance premiums according to the utilization rates of Medicare patients in the hospital. Pursuant to the 1980 amendments to the Medicare Act, 42 U.S.C. § 1395oo (f)(1), the plaintiffs initiated actions before the PRRB to determine whether the Board had jurisdiction to decide the validity of the rule. The PRRB issued a final decision stating it lacked the authority to decide the validity of the Malpractice Rule, thus permitting the plaintiffs to bring this action in district court.

The plaintiffs allege that the Malpractice Rule is invalid for three major reasons: (1) the promulgation of the rule did not comport with the requirements of the Administrative Procedure Act; (2) the rule is arbitrary and capricious and an abuse of discretion within the meaning of the Administrative Procedure Act; and (3) the regulation violates the Medicare Act because it fails to reimburse the plaintiffs for all costs actually incurred in the delivery of care to Medicare patients. The defendants refute all these allegations, and move this court to uphold the Malpractice Rule as a valid exercise of the Secretary's executive powers, in full compliance with the mandates of the

Medicare Act and APA. For the reasons stated below, the court finds that the Malpractice Rule was issued in compliance with the APA, and that it is consistent with the requirements of the Medicare Act.

## I. *The Procedural Requirements of the APA*

The Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* requires that, to promulgate a rule properly, an agency must publish a notice of proposed rulemaking (NPRM) in the Federal Register sufficiently detailed to invite informed public comment. The final rule must contain a basis and purpose statement explaining and supporting the Secretary's final decision and addressing major criticism. *Vermont Yankee Nuclear Power Co. v. NRDC,* 435 U.S. 519, 556, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). The plaintiffs allege five defects in the notice and comment proceedings respecting the Malpractice Rule: (1) the agency failed to employ notice and comment procedures for the national ratio figure which determines malpractice reimbursement for all hospitals with no paid Medicare claims history during the relevant five-year period; (2) the notice and comment procedure did not provide sufficient information to allow effective comments; (3) the final rule did not include an adequate basis and purpose statement; (4) the Secretary did not adequately respond to the comments which were offered and (5) the entire rulemaking proceeding was a sham since the Secretary had already rendered a final decision before undertaking the notice and comment process.

### A. *The National Ratio*

▪ The APA requires that all parties be provided with a statement including the intended purpose of the regulation and a summary of the supporting background research. This circuit stated in *Forester v.*

---

Health Care Financing Administration will calculate this ratio periodically based on the most recent departmental closed claim study.
If a provider pays allowable uninsured malpractice losses incurred by Medicare beneficiaries, either through allowable deductible or

coinsurance provisions, or as a result of an award in excess of reasonable coverage limits, or as a governmental provider, such losses and related direct costs must be directly assigned to Medicare for reimbursement. [42 C.F.R. § 405.452(b)(1)(ii).]

*Consumer Product Safety Commission,* 559 F.2d 774, 787 (D.C.Cir.1977):

> Section 553(b) does not require that interested parties be provided precise notice of each aspect of the regulations eventually adopted. Rather, notice is sufficient if it affords interested parties a reasonable opportunity to participate in the rulemaking process.

The NPRM contained a full explanation of the intended action: the Secretary would reduce reimbursed malpractice costs by introducing a formula linking reimbursement to paid claims losses rather than utilization rate. The NPRM referred to the possibility of a national ratio alternative without specifying the exact figure, however, notice and comment proceedings need not contain every element of the final rule. As our Circuit noted:

> The whole rationale of notice and comment rests on the expectation that the final rules will be somewhat different—and improved—from the rules originally proposed by the agency. [*Trans Pacific Freight v. Federal Maritime Comm'n,* 650 F.2d 1235, 1249 (D.C.Cir.1980).]

In this case, the Secretary gave notice of his intent to profoundly alter the method of compensating hospitals for malpractice insurance premiums in compliance with the APA.

### B. *Basis and Purpose*

The plaintiffs find the Secretary's basis and purpose statement inadequate for five separate reasons. The plaintiffs' contentions all concern the Secretary's failure to disclose important information addressing (1) whether paid malpractice claims are significantly lower for Medicare patients; (2) whether insurance companies take paid claims into account; (3) whether general and administrative (G & A) costs were disproportionately reimbursed by Medicare; (4) whether providers could reasonably fulfill the administrative requirements of the new regulation; and (5) whether the rule was fair and consistent with the Medicare Act. Many of the issues raised regarding the inadequacy of the basis and purpose statement are also claims furthered by the plaintiffs under the "arbitrary and capricious" rubric. These issues are alleged as procedural violations of the APA because "judicial review is meaningless where the administrative record is insufficient to determine whether the action is arbitrary and capricious." *National Welfare Rights Organization v. Mathews,* 533 F.2d 637, 648 (D.C.Cir.1976).

■ The basis and purpose statement serves the primary function of permitting the courts to scrutinize "why and how the regulations were actually adopted." *Amoco Oil Co. v. EPA,* 501 F.2d 722, 739 (D.C. Cir.1974). In informal rulemaking proceedings, the statement must alert the reader to the background behind the comments, but other sources may be used to cast light on the factual basis of the statement. *EDF v. EPA,* 465 F.2d 528 (D.C.Cir.1972).

■ It appears that the Secretary promulgated the Malpractice Rule in accordance with this APA requirement. The "why" of the regulation is crystal clear— the Secretary believed Medicare paid an excessive percentage of malpractice costs relative to the benefit received by Medicare patients. No party to this action actively disputes the legitimacy of this belief. The "how" question is a little more cloudy. The Secretary stated that the rule was based on a "study conducted by an HEW consultant" without detailing the procedure followed in the study or any results obtained. Although a more detailed analysis may be desirable, its absence is not fatal to the rulemaking process. The basis and purpose statement included an explanation of the background of the rule and cited scientific support for the regulation in the form of the Westat Report, fulfilling the basic requirements of the APA.

### C. *Sufficient Information*

■ The plaintiffs argue that when a rule is based on "scientific data" the agency must identify the data, describe the scientific methodology used and provide sufficient information to elicit informed comments. Detailed information on methodolo-

gy is not necessary, if the basis for the rulemaking can be found in other, relevant sources. *EDF v. EPA*, 465 F.2d 528, 537 (D.C.Cir.1972). The Secretary's primary scientific resource was the Westat Report—a study of malpractice claims closed by nine insurance companies during a four-month period in 1976. The Westat Report was not widely distributed throughout the health care community, however, major health care organizations received copies, including the American Hospital Association, the Hospital Corporation of America and the Federation of American Hospitals.[2] These organizations offered comments criticizing the statistical validity of the Westat Report.[3]

It appears from the record submitted in this case, that the information supplied by the Secretary met the requirements of the APA. Ideally, the Secretary could have developed more than one study. However, the defendants maintain that the regulation is the result of four years of internal evaluation.[4]

### D. *Discussion of Comments*

■ The final rule was published on June 1, 1979, 44 Fed.Reg. 31641. It did not comprehensively address all of the critical comments and questions received by the Secretary. The Secretary briefly explained his rationale in the four major areas of concern, addressing primarily the fairness and efficacy of the proposed rule. The APA does not demand that each comment or issue be addressed directly. The Secretary's brief responses fulfilled the minimum requirements of the statute.

### E. *Sham Rulemaking*

■ The plaintiffs allege that the rulemaking procedure was a sham because the Secretary had decided to promulgate the rule before notice and comment proceedings were undertaken. As evidence, the plaintiffs point to the budget proposal

which the Secretary developed well before he published the NPRM. The proposal reflected the estimated funds the department would save by promulgating a rule limiting reimbursement of malpractice costs.

The court is not persuaded that the publishing of a budget proposal proves that the entire rulemaking procedure was a sham. The elimination of disproportionate government expenditure frequently provides the public policy impetus behind the issuing of regulations. A sham rulemaking is engaged in solely to protect a previously-rendered decision. *Chamber of Commerce v. OSHA*, 636 F.2d 464, 470 (D.C.Cir.1980). The Secretary solicited comments in what appears to be a sincere effort to refine reimbursement procedures for malpractice premiums and remedy a perceived inequity in the government's cost.

The additional fact that the Secretary proceeded to promulgate a final rule even though the comments were unanimously in opposition, does not prove that the Secretary failed to consider the comments. A properly supported regulation may be promulgated after a careful consideration of comments, even if those comments unanimously and actively counter promulgation. This is particularly true if the industry comments merely reflect hostility to any change in the reimbursement methods, and fail to offer constructive alternatives to the utilization method of reimbursement.[5] The Secretary's decision to publish the rule under these circumstances does not run afoul of any APA provision.

### II. *The Substantive Provisions of the APA*

■ The court must affirm an agency decision to promulgate a regulation unless the party contesting the regulation can meet its burden of showing the rule was "arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(2)(A), 42 U.S.C.

---

2. Plaintiffs' brief at 10.

3. Plaintiffs' exhibits 17, 18, 19.

4. Defendants' brief at 6.

5. Defendants' brief at 45.

§ 1395oo(f). The Secretary has the responsibility to provide the public with sufficient factual findings and articulated policy support to permit the court to understand the rational basis of the decision. *Diplomat Lakewood, Inc. v. Harris*, 613 F.2d 1009, 1018 (D.C.Cir.1979). The issue presented under the arbitrary and capricious rubric is whether the court can find the Secretary "gave 'reasoned consideration to the problem'" of overreimbursement for malpractice costs. *Diplomat Lakewood, supra* at 1019, *citing National Association of Food Chains, Inc. v. ICC*, 535 F.2d 1308, 1316 (D.C.Cir.1976).

 The plaintiffs argue that the Malpractice Rule is arbitrary, capricious and an abuse of discretion on many grounds: the rule results in bizarre consequences; it is anathema to sound public policy; it was promulgated without any evidentiary basis; and it imposes an extreme administrative burden.

First, the plaintiffs contend that the rule results in bizarre consequences since some hospitals will be reimbursed for a high percentage of malpractice costs and others—even with a large population of Medicare patients—will be reimbursed at only the national ratio figure of 5.1%. Thus, the reimbursement scheme bears no logical relation to the rate of Medicare patients using the "service" of guaranteed protection against malpractice risk. This contention is not completely accurate. By averaging the five-year paid claims experience of a hospital, the Secretary is attempting to peg reimbursement to the malpractice experience of a hospital and the actual risk that the hospital will have claims lodged against it. The Malpractice Rule does not gauge reimbursement by premium cost. However, the Secretary is not required to adhere to accepted industry practices in promulgating regulations. *See Richey Manor v. Schweiker*, 684 F.2d 130 (D.C.Cir.1982) (accounting and legal principles); *American Medical Int'l v. HEW*, 466 F.Supp. 605 (D.D.C.1979) (accounting principles).

Second, the plaintiffs argue that the Malpractice Rule runs counter to the public welfare because it encourages providers simply to pay Medicare claims but to fight all non-Medicare claims. Additionally, the plaintiffs contend that providers are deterred from reducing the frequency and severity of injuries to Medicare patients because of the financial loss which will result if no malpractice claims are paid. The court must believe that there will be a good faith acceptance of this regulation on behalf of the medical community: providers will continue to offer the highest possible quality of care and insurers will handle all claims in an equitable fashion.

Third, the plaintiffs argue that there is no valid evidence to support the Secretary's underlying assumptions; the Malpractice Rule is therefore based on irrational classifications and must be invalidated. The plaintiffs rely on (1) affidavits submitted testifying to the invalidity and inaccuracy of the conclusions in the government's primary statistical support, the Westat Report (plaintiffs' exhibit 15); and (2) an internal study demonstrating that G & A costs balanced out only when malpractice costs were included (plaintiffs' exhibit 26).

The statistical weaknesses of the Westat Report do not undermine the government's premise that the reimbursement of malpractice costs was borne disproportionately by the government before the promulgation of the Malpractice Rule. The major criticism leveled by the plaintiffs is that the national ratio figure of 5.1% is unsound because of the statistical inaccuracy of the report which produced that figure. However, over the long term, few facilities will be reimbursed according to this figure.

The plaintiffs contend that even assuming that malpractice costs for Medicare patients were overreimbursed, considered alone, this does not indicate that the government was actually overreimbursing since all G & A costs balance out in the cost centers. By discrete costing only malpractice costs, the plaintiffs argue, the government upsets the reimbursement balance in the cost center. Although the administrative record discloses that the discrete-costing of all items in a particular

hospital would result in greatly increased costs for Medicare,[6] the administrator retains significant discretion to realign reimbursement methods. The Secretary need only guarantee that reimbursement determinations reflect the cost actually incurred by Medicare patients. *Presbyterian Hospital of Dallas v. Harris,* 638 F.2d 1381 (5th Cir.1981). If the Secretary fulfills this responsibility, malpractice costs may be removed from the G & A cost center, and the remaining G & A costs may be reimbursed on an overall utilization rate basis.

Fourth, the plaintiffs believe that the Malpractice Rule threatens the risk management services provided by hospitals, since some of these services are included in insurance premium payments and would not be reimbursed under the Malpractice Rule. An adjustment in insurance billing practices could resolve this industry-related problem. Like many of plaintiffs' objections to the regulation, the problem of the arbitrary reimbursement of risk management expenses springs from a lack of uniformity in industry practices. The Secretary is under no responsibility to conform to industry custom, or to guarantee that Medicare reimbursement will accommodate industry procedures. *Richey Manor v. Schweiker, supra.*

While it is true that the hospital and insurance industries will be required to shoulder a greater administrative burden at the outset, and calculate the Medicare paid claims history in each hospital over the past four years, this hurdle is only temporary. Furthermore, it is not so unreasonable as to render the regulation arbitrary and capricious. The record does not provide substantial evidence that the new regulation will raise premium rates and disrupt the insurance industry. Abstractly, the regulation may inject more uncertainty into the insurance industry respecting the financial ability of an individual

hospital to assume more of its malpractice costs. However, premiums should not be affected in any significant way, since the hospitals are facing no increased risk.

### III. *The Medicare Act*

Under the Medicare Act, 42 U.S.C. § 1395x(v)(1)(A), the Medicare program must reimburse the "reasonable cost" of medical services, which includes "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services."[7]

The plaintiffs argue that the Malpractice Rule violates the statutory mandate because it fails to reimburse the reasonable direct and indirect costs "actually incurred" by providers, thereby shifting these costs to non-Medicare patients. In addition, the plaintiffs contend that the regulation is invalid because the Secretary failed to consider third-party payor practices when drafting the rule.

#### A. *Standard of Review*

Under the Social Security Act Congress entrusted to the Secretary rather broad authority to regulate cost reimbursement to providers under the health care programs. Courts have consistently held that deference should be given the Secretary's decision in these matters, and that they "should be upheld if [they are] reasonably consistent with the statute." *Richey Manor, Inc. v. Schweiker,* 684 F.2d 130, 134 (D.C.Cir.1982).

#### B. *Reasonable Costs*

A threshold issue is whether malpractice costs are necessary or whether the Secretary has the discretion to deem them non-reimbursable. The plaintiffs argue that the statute is clear: the Secretary must

---

**6.** Plaintiffs' exhibit 26, Internal Memorandum HEW, July 12, 1978.

**7.** The statute also requires that the Secretary consider two additional factors when developing regulations to reimburse "reasonable cost": (1) principles applied by established prepay-

ment organizations when making third party payment for medical care and (2) the direct and indirect costs of care, so as not to shift the cost to non-Medicare patients. 42 U.S.C. § 1395x(v)(1)(A).

reimburse all reasonable, necessary costs both direct and indirect. The defendants reply that the Secretary must only reimburse those costs he finds "necessary to the delivery of care." [8] The defendants' argument tends to muddy the relatively clear language of the statute. The Secretary must reimburse malpractice costs if they are necessary to the efficient delivery of care. Malpractice costs are not "unnecessary", as the defendants imply, because a hospital may not function absent malpractice coverage.[9] The Secretary has, in effect, admitted that some malpractice costs are reimbursable.

In order to comply with the provisions of the Medicare Act, the Malpractice Rule must reimburse malpractice costs actually incurred in providing services to Medicare patients. The plaintiffs contend that this includes the costs of malpractice insurance as dictated by the insurance industry, according to the amount of risk exposure per patient day. But this formula fails to accommodate the Secretary's findings that Medicare patients present a lower risk than non-Medicare patients. The Secretary has considerable discretion to evaluate the cost incurred by Medicare patients, without reference to industry practices. *See, Richey Manor v. Schweiker,* 684 F.2d 130, 135 (D.C.Cir.1982); *American Medical Int'l v. HEW,* 466 F.Supp. 605, 623 (D.D.C.1979), *aff'd,* 677 F.2d 118. The defendants indicate that the Malpractice Rule attempts to more fairly apportion malpractice costs between Medicare and non-Medicare patients. Conceding that the Malpractice Rule may not achieve this objective in the most accurate fashion, the defendants rely on the Secretary's discretion, and the fact that during the notice and comment proceedings no alternative was proposed, to validate the final rule.

The court finds that the Secretary may legitimately attempt to strike a balance which more fairly apportions malpractice costs between the provider and the government. The compromise embodied in the Malpractice Rule presents a rationally-based attempt by the Secretary to reimburse only the necessary, reasonable costs of malpractice insurance according to the risk actually run by each individual provider. Although the rule does not adhere to the price-setting mechanisms in the insurance industry, the Secretary is free to develop independent practices.

### C. Cost-Shifting

The thorniest problem presented in this case is whether, by isolating malpractice costs from the other G & A costs, the burden of carrying both G & A and malpractice costs is impermissibly shifted onto non-Medicare patients. 42 U.S.C. § 1395x(v)(1)(A).

### 1. Malpractice Costs

The plaintiffs contend that the reduction in reimbursement of malpractice costs under the rule impermissibly shifts these costs onto non-Medicare patients. The plaintiffs point to their own record, clear of malpractice payouts, and argue that the government will only reimburse Boswell at 5.1% of its total malpractice costs, although Medicare occupancy at the hospital exceeds 80%. Since its malpractice premiums have not been altered, the low percentage of non-Medicare patients must carry the difference.

The defendants argue that the additional malpractice costs, since they are not recognized as costs of the program, are therefore unnecessary and cannot be shifted. However, the Secretary has admitted that some proportion of these costs are neces-

---

**8.** Defendants' Memo, p. 19.

**9.** Malpractice costs cannot be characterized as "unnecessary" to the "efficient delivery of services" in the same manner as other extraneous services which have been disallowed. *Cf. St. Mary of Nazareth Hosp. Center v. Dept. of Health & Human Services,* 698 F.2d 1337 (7th Cir.1983)

(bedside telephones); *Sierra Vista, Inc. v. United States,* 687 F.2d 422 (Ct.Cl.1982) (franchise tax on profits); *Richey Manor, Inc. v. Schweiker,* 684 F.2d 130 (D.C.Cir.1982) (interest expenses and depreciation costs); *American Med'l Int'l v. HEW,* 466 F.Supp. 605 (1979), *aff'd* 677 F.2d 118 (D.C.Cir.1981) (profit losses).

sary and should be reimbursed. The relevant question, therefore, is whether the percentage of the malpractice costs incurred by hospitals for care of Medicare patients must be reimbursed at a different rate than that determined under the Malpractice Rule.

The premise of the paid-claims basis for the Malpractice Rule is that over a five-year period, each hospital will be reimbursed according to actual malpractice liability. Although Boswell is only reimbursed for 5.1% of malpractice expenses in one year, the payout of one Medicare malpractice claim may mean complete malpractice reimbursement in the next year.[10] Over the long run, Medicare will shoulder its share of malpractice insurance costs.

b. *General and Administrative Costs*

The plaintiffs also claim that the Malpractice Rule, by removing malpractice costs from the G & A cost centers, upsets the presumption that costs incurred by Medicare patients will balance out when aggregated in the cost centers and reimbursed according to the utilization rate.

The court accepts the defendants' argument that the various costs accumulated in the G & A cost centers are not demonstrably more attributable to Medicare than non-Medicare patients. When the Secretary discovered that malpractice costs were overreimbursed, the presumption that all G & A costs balanced out evaporated. Until evidence is provided that other costs are improperly reimbursed, the Secretary is entitled to discrete cost malpractice insurance costs, and preserve the presumption that the other G & A costs balance out in the cost center.

D. *Third-Party Payor*

▮ Finally, the plaintiffs contend that the government violated the Medicare Act by failing to consider third-party payor principles in promulgating the rule. The rulemaking record in this case is replete with testimony by providers that malpractice insurance costs are reimbursed according to the utilization rate by other third-party payors. The Secretary generated no internal record to indicate these principles were considered, however, it is difficult for the court to imagine that the Secretary completely failed to consider the third-party payor practices. The Secretary was aware that the new policy did not conform to third-party payor practices, and chose to proceed with the rulemaking.

CONCLUSION

The Secretary's decision to promulgate the Malpractice Rule was based on a reasonable belief that Medicare was overreimbursing providers for malpractice costs relative to the malpractice risk actually posed by Medicare patients. A study covering 84% of all closed claims over a four-month period revealed overreimbursement under the utilization rate formula. The Secretary relied on this study to develop a program which reimburses providers based on actual loss experience. While it is true that this new rule does not conform to industry practices, it is not irrational. The Secretary rendered a decision based on sound assumptions with factual support. The court cannot find that the rulemaking was arbitrary, capricious or an abuse of the Secretary's discretion, or that the regulation violates the letter or spirit of the Medicare Act.

---

**10.** Since Boswell's Medicare occupancy rate exceeds 80%, it is likely that any malpractice claim will be lodged by a Medicare patient.