**ST. JAMES HOSPITAL, Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

No. 83 C 2773.

United States District Court, N.D. Illinois, E.D.

Jan. 27, 1984.

759

James M. Gaynor, Jr., John J. Jawor, McDermott Will & Emery, Chicago, Ill., John T. Ward, Leonard C. Homer, Margaret M. Manning, Ober, Kaler, Grimes & Shriver, Baltimore, Md., for plaintiff.

Juan A. Del Real, General Counsel, Dept. of Health & Human Services, Ann T. Hunsaker, Asst. Gen. Counsel, Sheree R. Kanner, Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION

WILL, District Judge.

In this action, plaintiff, a provider of services under Part A of the Medicare program, 42 U.S.C. § 1395x(u), challenges an administrative regulation, 42 C.F.R. § 405.-452(b)(1)(ii)[1], which alters the computation formula, in effect since the inception of the Medicare program in 1966, used to reimburse provider hospitals for the costs of

malpractice insurance. Before us are plaintiff's and defendant's cross-motions for summary judgment and defendant's motion to strike plaintiff's affidavits in Attachment C to its complaint for declaratory and injunctive relief and sums due under the Medicare statute. For the reasons hereinafter stated:

(1) plaintiff's motion for summary judgment is granted;

(2) defendant's motion for summary judgment is denied;

(3) the matter is remanded to the Secretary for further consideration in accord with this opinion; and

(4) we grant defendant's motion to strike that portion of Attachment C, namely Vol. II, which contains the affidavits of "expert witnesses".

I.

As a participant in the Medicare program, a hospital must file a "provider agreement" with the Secretary of Health and Human Services, 42 U.S.C. § 1395cc, under which it agrees not to charge any Medicare patient for services covered by the Medicare program, in return for reimbursement by the program of the "reasonable cost" of such services. 42 U.S.C. § 1395f(b)(1)(A). Payment to providers of services is made directly or through fiscal intermediaries, such as Blue Cross/Blue Shield pursuant to contract with the Secretary. 42 U.S.C. § 1395h. After the close of its fiscal year, a provider submits a "cost report" reflecting costs incurred during the fiscal year and an apportionment of

---

**1.** 42 C.F.R. § 405.452(b)(1)(ii) provides:

(1) *Exception:* For cost reporting periods beginning on or after July 1, 1979, costs of malpractice insurance premiums and self-insurance fund contributions must be separately accumulated and directly apportioned to Medicare. The apportionment must be based on the dollar ratio of the provider's Medicare paid malpractice losses to its total paid malpractices losses for the current cost reporting period and the preceding 4-year period. If a provider has no malpractice loss experience for the 5-year period, the costs of malpractice insurance premiums of self-insurance fund contributions must be apportioned to Medi-

care based on the national ratio of malpractice awards paid to Medicare beneficiaries to malpractice awards paid to all patients. The Health Care Financing Administration will calculate this ratio periodically based on the most recent departmental closed claim study.

If a provider pays allowable uninsured malpractice losses incurred by Medicare beneficiaries, either through allowable deductible or coinsurance provisions, or as a result of an award in excess of reasonable coverage limits, or as a governmental provider, such losses and related direct costs must be directly assigned to Medicare for reimbursement.

those costs between Medicare and non-Medicare patients. 42 C.F.R. §§ 405.-406(b), 405.453(f).

In its complaint, filed April 21, 1983, plaintiff challenges the intermediary settlement of its cost year ending in 1980. During that cost year, plaintiff had a provider agreement with the Secretary for the provision of Medicare services. Prior to the challenged regulation, plaintiff was reimbursed for its malpractice premium costs on the basis of Medicare utilization of services, which was approximately 30 percent for the cost year in issue. However, the fiscal intermediary determined reimbursement for plaintiff's malpractice costs for that cost year on the basis of the challenged malpractice apportionment regulation, rather than on the former basis of utilization. This resulted in reimbursement of only 20.11 percent of plaintiff's malpractice insurance costs. At issue is $24,159 in denied Medicare reimbursement; allegedly the difference in sum between the reimbursement of 20.11 percent and the Medicare utilization rate of 30 percent for the cost year in issue.

On June 3, 1981, plaintiff, together with many Florida hospitals and one Alabama hospital, requested a group hearing before the Provider Reimbursement Review Board ("PRRB") pursuant to 42 U.S.C. § 1395oo (a), appealing the malpractice insurance costs allowed in its Notice of Program Reimbursement, and thus challenging the legality of the malpractice regulation. The PRRB decided that it lacked authority to determine whether the Medicare regulation governing reimbursement for malpractice insurance, 42 C.F.R. § 405.452(b)(1)(ii) (June 1, 1979), is valid, found that the case falls within 42 U.S.C. § 1395oo (f)(1), and granted the providers' requests for an expedited judicial review of the malpractice insurance issue. Thus, this case is before us pursuant to 42 U.S.C. § 1395oo which states in relevant part:

Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines ... that it is without authority to decide the question....

## II.

We are not the first court confronted with the issue of the validity of the new malpractice regulation. To date, seven courts have ruled on this matter. Three courts have invalidated the regulation. *See Mt. Carmel Mercy Hospital v. Margaret M. Heckler,* 581 F.Supp. 1311 (E.D. Mich.1983) (J. DeMascio); *Abington Memorial Hospital v. Heckler,* 576 F.Supp. 1081 (E.D.Pa.1983) (J. Fullam); *Chelsea Community Hospital v. Margaret M. Heckler,* No. 83CV–6126–AA, (E.D.Mich. Dec. 20, 1983) (J. Joiner). Four courts have upheld the regulation. *See Athens Community Hospital v. Heckler,* 565 F.Supp. 695 (E.D.Tenn.1983) (J. Taylor), *appeal docketed,* No. 83–5546 (6th Cir. Aug. 5, 1983); *Cumberland Medical Center v. Heckler,* 578 F.Supp 39 (M.D.Tenn. June 22, 1983) (J. Morton), *appeal docketed,* No. 83–5549 (6th Cir. Aug. 9, 1983); *Humana of Aurora, Inc., d/b/a Aurora Community Hospital v. Heckler,* No. 83–Z–70 (D.Colo. Sept. 19, 1983) (J. Weinshienk), *appeal docketed,* No. 83–2417 (10th Cir. Nov. 4, 1983); *Walter O. Boswell Memorial Hospital v. Heckler,* 573 F.Supp. 884 (D.D.C.1983) (J. Bryant), *appeal docketed,* No. 83–2223 (D.C.Cir. Dec. 2, 1983). Four substantive opinions have been written; Judges Fullam and DeMascio have invalidated the malpractice rule and Judges Taylor and Bryant have upheld the rule.[2] Because these courts have well-described the basic facts concerning the malpractice regulation, we shall not belabor the story. However, in the interests of clarity, we will briefly sketch the undisputed facts underlying this action.

**2.** In *Chelsea,* Judge Joiner adopted Judge DeMascio's opinion in *Mt. Carmel.* Similarly, in *Cumberland,* Judge Morton followed Judge Taylor's opinion in *Athens.* Judge Weinshienk issued her opinion from the bench and no written opinion will be issued. *Humana* Tr. at 56.

## III.

Prior to the challenged regulation, effective July 1, 1979, malpractice insurance costs were included in the "General and Administrative" category ("G&A") of hospital expenses, along with other insurance costs and such costs as administrative salaries. To apportion G&A between Medicare and non-Medicare patients, Medicare reimbursed hospitals for the costs of malpractice insurance based upon the ratio of Medicare patient utilization of the hospital's services to total patient utilization—the percentage of patient bed-days used by Medicare patients. The effect of this, albeit simplified, is that prior to July 1, 1979, if a hospital's services were utilized "x" percent by Medicare patients, the hospital would be reimbursed "x" percent of its malpractice insurance premium costs by the Medicare program.[3]

In contrast, effective July 1, 1979, the challenged malpractice rule reimburses a hospital for that percentage of its malpractice insurance costs equal to the ratio of malpractice losses it has paid to Medicare beneficiaries to total malpractice losses paid to all patients during the current and four preceding years. 42 C.F.R. § 405.-452(b)(1)(ii). Further, hospitals with no malpractice loss experience for the five-year period will be reimbursed for only 5.1 percent of their insurance costs for the year.[4]

The effects of the final rule differ markedly from the previous rule. For example, if a hospital's insurer has paid $100,000 to Medicare claimants and $200,000 to non-Medicare claimants during the five-year period, the hospital would be reimbursed for one-third of its malpractice insurance costs for the current year.

Plaintiff offers an example of the impact of the regulation on a hypothetical hospital with a 60 percent Medicare utilization rate and malpractice insurance premiums of $100,000 per year. Under the prior regulation, Medicare would have reimbursed this hypothetical hospital approximately $60,000 for its malpractice insurance premium costs. Under the challenged regulation, reimbursement would occur as follows:

(1) If the hospital, during the relevant five-year period specified by the challenged regulation, pays only one malpractice claim, no matter what the amount, to a Medicare recipient, Medicare will reimburse the hospital $100,000 or 100% of its malpractice insurance costs;

(2) If, instead of paying a single malpractice claim to a Medicare recipient, the same amount is paid as the result of a claim by a non-Medicare recipient, Medicare will reimburse the hospital *none* of its malpractice insurance costs;

(3) If the hospital makes no payments on malpractice claims during the relevant five-year period, Medicare will reimburse the hospital only $5,100, or 5.1% of its malpractice insurance costs.

Pl.Br. at 3. The Secretary says these examples are "patently ludicrous" and "extreme", and that the new formula represents a fair estimate of Medicare's share of the risk. Def.Br. at 32–33. However, we find that under the very terms of the challenged regulation the reimbursements to the hypothetical hospital cited by plaintiff would be as plaintiff posits. *See Mt. Carmel Mercy Hospital, supra,* at 1317 ("This national ratio completely ignores the risk element of insurance.... [The examples] show that it is merely fortuitous whether a hospital is properly reimbursed for its malpractice insurance costs."); *Abington Memorial Hospital, supra,* at 1088.

---

**3.** This was done pursuant to 42 U.S.C. § 1395x(v)(1)(A) (1979) which allows for payment of "reasonable cost" of the services, which is defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services."

**4.** Under the proposed rule, these hospitals were to obtain from an independent actuary an estimate of Medicare's share of current malpractice costs. 44 Fed.Reg. 15744, 15745 (1979). The final rule eliminates and replaces it with a national ratio of 5.1 percent, a figure derived from data in the consultant's study cited by the Secretary. *See Abington Hospital, supra,* at 1083–1084.

## IV.

Before we address plaintiff's procedural and substantive challenges to the regulation, we must, as a preliminary matter, decide the issues raised by the Secretary's motion to strike plaintiff's affidavits in Attachment C to its complaint. We previously denied the Secretary's motion to dismiss this action or, alternatively, to strike all attachments and those portions of the complaint referring to the attachments. We instructed her to answer, but did not require her to plead to the attachments in her answer. Mem.Op. (Sept. 19, 1983). For purposes of her present motion to strike certain portions of Attachment C, the issues command a different result.

The affidavits in issue here are from James P. Bedingfield, an Associate Professor of Accounting and Certified Public Accountant, Edward D. Hollander, a consulting economist with expertise in health economics and health insurance, W. James MacGinnitie, an actuary with extensive experience in the area of medical malpractice insurance, Douglas G. Olson, an Associate Professor of risk management, insurance, and health care systems, and David D. Willman, a Certified Public Accountant. These five affidavits were filed with the PRRB and, in part, form the basis for plaintiff's challenge to the Westat study, upon which the Secretary relied in drafting the new regulation.

The Secretary contends that none of these affidavits are part of the rulemaking record and thus they should be stricken. She is correct. It is well-settled that a reviewing court is required to "review the whole record" in determining the validity of a regulation, 5 U.S.C. § 706, and that the "whole record" consists solely of the administrative rulemaking record. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 420, 91 S.Ct. 814, 825, 826, 28 L.Ed.2d 136 (1971). Litigation affidavits, such as those presented by plaintiff, are merely *"post hoc"* rationalizations and do not constitute the " 'whole record' compiled by the agency...." *Overton Park, supra,* at 419, 91 S.Ct. at 825 (citations omitted).

Plaintiff contends that the proffered affidavits (1) set forth basic accounting principles available to the agency during the rulemaking and (2) in part merely re-tabulate the actual Westat data which the agency used as the basis for the rule. But this does not satisfy the requirement of being the "whole record" before the agency.

Alternatively, plaintiff urges that we may consider these affidavits, though outside the administrative record, based on certain exceptions; if the materials postdating the rule (1) clarify or explain the original information before the agency, *Association of Pacific Fisheries v. EPA*, 615 F.2d 794, 811 (9th Cir.1980); or (2) show that the agency's assumptions were fictional or without scientific support, *id.;* or (3) will assist the court in determining whether the agency considered all the relevant factors. *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C.Cir.1981).

We are not persuaded by plaintiff's suggestions. Indeed, in *Environmental Defense Fund, supra,* at 285–286, cited by plaintiff, the District of Columbia Circuit Court found that the motion to strike litigation affidavits of affiants who were neither employees of EPA nor participants in the agency actions to have been properly granted. *See also Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir.1980), also cited by plaintiff ("[W]e think the district court went too far in its consideration of evidence outside the administrative record.") Presented with similar matter, Judge Fullam found that the lengthy affidavits detailing additional flaws in the Westat study were not properly before the court. *Abington Memorial Hospital, supra,* at 1087 n. 4. Persuaded by the reasoning of these courts and convinced that the voluminous briefs and the rulemaking record properly before this court furnish more than adequate information about the validity and reliability of the Westat study without these litigation affidavits, we grant defendant's motion to strike plaintiff's affidavits in Attachment C.

## V.

We now turn to plaintiff's procedural and substantive attacks on the malpractice rule. Our inquiry concerning the validity of the rule must focus on whether the Secretary acted within the scope of her statutory power, whether the actual choice made was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", and whether the Secretary complied with the necessary procedural requirements in promulgating the rule. *Overton Park, supra,* 401 U.S. at 416–417, 91 S.Ct. at 823–824.

 We recognize that the standard of review of an agency's decision is a narrow one; "[t]he court is not empowered to substitute its judgment for that of the agency." *Id.* at 416, 91 S.Ct. at 824. However, the judicial deference usually afforded to an agency's determination of how best to achieve statutory policies enacted by Congress "cannot be allowed to slip into judicial inertia," *Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Authority,* — U.S. —, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983); *American Ship Building Co. v. NLRB,* 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965). Courts "are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). Moreover, "[i]f Congress established a presumption from which judicial review should start, that presumption ... [is] *against* changes in current policy that are not justified by the rulemaking record." *Motor Vehicle Manufacturers Association, of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.,* — U.S. —, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (emphasis in original). With these considerations in mind, we address the merits of plaintiff's challenge to the rule.

### Notice

Plaintiff first contends that the agency failed to comply with the procedural requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, in that it (1) failed to issue a sufficient notice of the rulemaking and (2) failed to provide an adequate basis and purpose statement with the malpractice regulation.

 The test of the adequacy of a Notice of Proposed Rulemaking ("NPRM") is whether it "fairly apprise[d] interested parties of all significant subjects and issues involved." *American Iron and Steel Institute v. EPA,* 568 F.2d 284, 291 (3d Cir. 1977), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978) (citations omitted). Plaintiff claims that the Notice was deficient as it referred only to a "study conducted by a HEW consultant", rather than identifying the Westat study by name. (However, the final rule did identify the report's author as Westat, Inc., *see* 41 Fed. Reg. 31641 (June 1, 1979).) Plaintiff contends that this "suppression" of information was an attempt to discourage comment on those aspects of the study in which the study's authors question the reliability and sample adequacy of the study itself, Pl.Ex. 22, and the "suppression" was further compounded by the agency's initial attempt to provide only a 45-day notice period, despite the 60-day requirement of Executive Order 12044. However, the agency subsequently extended the notice period to 60 days.[5]

---

5. There is some evidence that the Secretary, under budgetary pressures and deadlines, did engage in the administrative version of the football "hurry-up offense". *See, e.g.,* 44 Fed.Reg. at 15745 (Mar. 15, 1979) (initially allowing only 45 days for comment); Pl.Ex. 13, Mem. from Regulation Coordination branch (Feb. 16, 1979) ("Because of the urgency (to meet budget commitments) we are requesting concurrent HFCA and OS review in a very short turn around (2/22).

If major issues are raised, a policy meeting will be scheduled. The goal is to publish a final regulation by July 1, 1979."); Pl.Ex. 13 at 4, Mem. to Secretary from Administrator, Health Care Finance Administration (*"Urgency* [:] Since final regulations establishing new apportionment procedure must be effective for part of the FY 1979 if the HFCA budget is to be met, the Notice of Proposed Rulemaking must be published as soon as possible....")

It is important for "[a]n agency to identify and make available technical studies and data that it has employed in reaching the decision to propose particular rules." *Connecticut Light and Power Co. v. Nuclear Regulatory Commission,* 673 F.2d 525, 531 (D.C.Cir.), *cert. denied,* ——— U.S. ———, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982). While the agency here technically did not fully comply with this requirement, the record shows that although the Westat study was not widely distributed throughout the health care community, several major health care organizations such as the American Hospital Association, the Hospital Corporation of America, and the Federation of American Hospitals [6] received the consultant's report in time to review it before submitting comments criticizing the statistical validity of the Westat study. Thus we agree with those courts that have considered plaintiffs' attack on the sufficiency of notice and found that the notice was sufficient fairly to apprise the interested parties. *See Abington Memorial Hospital, supra,* at 1085; *Athens Community Hospital, supra,* 565 F.Supp. at 698; *Walter O Boswell Memorial Hospital,* 573 F.Supp. at 889–890.

### Basis and Purpose

The second prong of plaintiff's procedural attack under 5 U.S.C. § 553 is that the agency failed to provide an adequate basis and purpose statement with the malpractice regulation and failed to respond adequately to the uniformly negative public comments on the proposed rule. We believe that plaintiff's contention is correct— the agency failed to meet the standards provided by the statute and articulated by the courts.

Section 553(c) provides in relevant part:

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

. . . . .

It is clear that the statute requires an agency to *consider* the relevant matter and comments presented and to *incorporate* a concise general statement of their basis and purpose, for "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

The Secretary contends that the agency complied with the "basis and purpose" statement in its concise articulation published with the regulation in 44 Fed.Reg. 31641–42. But, as Judge Fullam notes:

It would have been a miracle of bureaucratic succinctness had the Secretary managed to reply adequately in two scant columns of Federal Register prose to the 600-plus comments that occupy five thick volumes of the administrative record. Unfortunately, no such miracle has been witnessed by this court, which instead finds the Secretary's response woefully inadequate.

*Abington Memorial Hospital, supra,* at 1086.

Judge Fullam found particularly disturbing, as do we, the complete lack of response to numerous comments challenging the statistical validity of the Westat study, the sole empirical study on which the change in malpractice reimbursement was based. While the discussion of major comments purportedly responded to "the most significant comments"—(1) opposition to the direct apportionment of malpractice costs; (2) direct assignment of overhead costs; (3) cash flow; and (4) claims management—44 Fed.Reg. 31641–42, the discussion did not address whether commenta-

---

**6.** These organizations represent 6400, 120, and 1000 hospitals respectively. *Abington Memorial Hospital, supra,* at 1085.

tors criticized the Westat report nor adequately respond to those criticisms. Also absent is any mention of Westat's written comments to the agency which cautioned that it was "virtually impossible to generalize beyond the sample" and that "there was no assurance that the sample was in any way representative", *see* Pl.Ex. 22 at 2 ¶ A, and cautionary comments within the study itself. *See, e.g.,* Pl.Ex. 21 at 2–9 (Westat study) ("Because the data base consists of a census of claims closed by nine private insurance carriers during a four month period in 1976, it is not altogether clear what constitutes the universe of claims from which this 'sample' was drawn. It seems proper, since this is a census, to make inferences only within the time frame for which the data were collected and only to the universe of claims closed by nine participating companies."); Pl.Ex. 21 at 2–1 ("The sample was judgmental, rather than a probability sample. . . .")

▅▅▅ That the Secretary "proceeded to promulgate a final rule even though the comments were unanimously in opposition, does not [in itself] prove that the Secretary failed to consider the comments." *Boswell, supra,* 573 F.Supp. at 890. However, "where apparently significant information has been brought to its attention [here, *e.g.,* the comments within the Westat study itself, the post-study comments by Westat people, and objections to the study raised by several major health care groups] or substantial issues of policy or gaps in its reasoning raised, the statement of basis and purpose must indicate why the agency decided the criticisms were invalid." *National Resources Defense Council, Inc. v. U.S. Nuclear Regulatory Commission,* 547 F.2d 633, 646 (D.C.Cir.1976), *rev'd on other grounds by Vermont Yankee Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

The notice and purpose statement in 44 Fed.Reg. 31641 fails to reflect the requisite exchange of views, information, and response to criticism; the agency failed to respond to significant points raised by the

public. *See Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35–36 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977), *reh. denied,* 434 U.S. 988, 98 S.Ct. 621, 54 L.Ed.2d 484 (1977). Absent from the statement are comments reflecting the "philosophy of candor" which must characterize a basis and purpose statement. *See* J. Wright, The Courts and The Rulemaking Process: the Limits of Judicial Review, 59 Cornell L.Rev. 375, 381 (1979). The record shows that the agency's general counsel had "technical problems" with the Final Regulations. *See* Pl.Ex. 20, Note from HEW, Office of the General Counsel (May 18, 1979) ("We do not believe that the preamble is adequate. Nor do we believe it is clearly written. HFCA received some 450 public comments on the NPRM. All of the public comments opposed the proposed regulation. Therefore we believe that HFCA needs to carefully explain why it is rejecting the public comments.") Given all this, we conclude that the agency failed to comply with section 553(c) of APA.

### Arbitrary and Capricious

[12] Plaintiff further contends that the promulgation of the malpractice regulation, 20 C.F.R. § 405.452(i)(ii), is violative of APA, 5 U.S.C. § 706(2)(A), which requires a reviewing court to hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. In this regard, we reiterate that our standard of review here is a narrow one, but "[j]udicial review in accordance with this standard is not toothless. . . ." *City of West Chicago v. U.S. Nuclear Regulatory Commission,* 701 F.2d 632, 648 (7th Cir.1983). By conducting a searching and careful inquiry into the facts, the court must consider whether the agency's decision was based on consideration of the relevant factors and whether there has been a clear error of judgment. *Overton Park, supra,* 401 U.S. at 416, 91 S.Ct. at 823, and whether the agency has articulated a rational connection between the facts found and the choice made. *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,*

— U.S. ——, 103 S.Ct. 2246, 2257, 76 L.Ed.2d 437 (1983).

■ The Secretary claims that the malpractice rule is a logical response to an immediate and serious problem—Medicare paying an allegedly disproportionate amount of malpractice costs under the prior program. The Secretary's, as well as the entire nation's, concern with the ever-escalating costs of Medicare, and indeed the entire social security program, and fear of financial insolvency is not unfounded. Nor does her concern with budgetary considerations evidence an arbitrary and unreasoned approach to a very serious problem. But this does not end our inquiry. Although "an agency must be given ample latitude to 'adapt their rules and policies to the demands of changing circumstances,'" *Motor Vehicle, supra,* 103 S.Ct. at 2866, the scope of our review does not change. *Id.*

■ An agency's rule is arbitrary and capricious if (1) the agency relied on factors which Congress had not intended it to consider; (2) the agency entirely failed to consider an important aspect of the problem; (3) if it offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be attributed to a difference in view or the product of agency expertise. *Id.* at 2867.

■ With these guidelines in mind, we agree with Judges Fullam and DeMascio that the rule is arbitrary and capricious. There are several reasons why the rule cannot pass judicial muster. First, the Westat study furnishes an inadequate basis for the rule as we previously noted in our discussion of the agency's compliance with the "basis and purpose" statement. In fact, the authors of the Westat study cautioned against extrapolation of wide-ranging conclusions and noted that "conclusions must be drawn very cautiously because of the possibility of biased data." *See* Westat Report at 2–3 (Pl.Ex. 21, Def.Ex. C). The authors note two potential sources of bias in the sample of claims. First, many claims had multiple defendants who were not always represented by participating companies and although reporting companies probably knew the total number of defendants "they could not provide us with specific information about their characteristics." *Id.* at 2–2. The second potential source of bias is that some providers, especially hospitals, are self-insuring and thus their claims had "no chance of turning up in the data base." *Id.*

In *Almay, Inc. v. Califano,* 569 F.2d 674, 677, 682 (D.C.Cir.1977), the court considered whether the FDA's reliance on a "flawed survey", about which the Director of FTC's Bureau of Consumer Protection who sponsored and designed the study warned that the results should be used with caution, constituted a violation of the arbitrary and capricious standards of 5 U.S.C. § 702(2)(A). The court held that reliance on the survey was a "'clear error of judgment.'" *Id.* at 682 (citation omitted). In the present case, reliance on the Westat study is similarly an error of judgment.

The other grounds upon which plaintiff relies in terming the rule arbitrary and capricious, including that the rule impermissibly shifts costs of care for Medicare patients to non-Medicare patients, are the same grounds on which it challenges the regulation as violative of the Medicare statute, 42 U.S.C. § 1395 *et seq.,* and thus we shall now address that contention.

### Violation of the Medicare Statute

■ The Medicare statute under which the agency promulgated the rule states that a provider hospital shall be reimbursed "[t]he reasonable cost of any services [which] shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services...." 42 U.S.C. § 1395x(v)(1)(A). To be valid, therefore, the regulation must take into account both a provider's direct and indirect costs, and may not cause costs properly allocable to care of Medicare patients to be shifted to non-Medicare pa-

tients. *Id.; Northwest Hospital, Inc. v. Hospital Service Corp.*, 687 F.2d 985, 989 (7th Cir.1982). Further, the cost regulation must be rational, non-arbitrary and must further the purposes of the Medicare statute. *Northwest* at 989. Plaintiff contends that the regulation falls far short of this standard because it fails to reimburse provider hospitals for insurance costs reasonably incurred in treating Medicare patients.

The statute affords the Secretary some discretion in prescribing regulations that determine the computation of the reasonable cost of services. But her discretion is not unlimited and certainly not beyond judicial review. We would not, of course, substitute our judgment for that of the Secretary, but if her interpretation of reasonable cost does not comport with statutory requirements then it should not be upheld. We cannot "rubber-stamp" administrative decisions that are inconsistent with statutory mandates. *See Bureau of Alcohol, Tobacco, and Firearms v. FLRA, supra,* 104 S.Ct. at 444.

Prior to the challenged regulation, the Secretary had aggregated all general and administrative ("G&A") costs, including malpractice insurance. Plaintiff argues that there is no logical reason to separate malpractice insurance from other insurance and other G&A costs. By so doing, the Secretary ignores the fact that insurance premiums are paid regardless of whether actual losses are incurred or not, and that malpractice insurance is designed to protect, necessarily, the assets of a hospital against potential catastrophic loss. *See Mt. Carmel, supra,* at 1315.

Earlier in this opinion we discussed the effects of the new regulation on hospital malpractice reimbursement. These effects prompted Judge Fullam to observe that the Secretary has chosen "an allocation formula which is least likely to reflect reality ... a formula which seemingly guarantees that the statutory mandate will inevitably be violated in most cases." *Abington Memorial Hospital, supra,* at 1089. This is so because:

(1) the ratio between malpractice claims paid on account of Medicare patients and malpractice claims paid on account of non-Medicare patients over the most recent five-year period has very little, if any, relationship to the hospital's current cost of maintaining malpractice protection. (2) The "national average" (currently estimated at 5.1%) of that ratio has even less bearing on the current malpractice coverage costs of any particular hospital. (3) The data relied upon in the Westate Report, including the data which produced the 5.1% figure, included both payments made to satisfy the liability of hospitals and claims paid to satisfy the liability of physicians. There is no evidence to support the conclusion that these combined payments provide reliable information about the malpractice payment experience of hospitals. Indeed, there is reason to believe that they do not....

*Id.* at 1089.

We emphasize that the Secretary is not, of course, limited to any one method of reimbursement and may use different methods for different costs and circumstances. This the statute clearly allows. 42 U.S.C. § 1395x(v)(1)(A). But when, as here, the chosen method neither assures that Medicare costs will not be borne by non-Medicare patients nor that hospitals will be reimbursed the reasonable costs of their services ("actual costs minus those found to be unnecessary in the efficient delivery of health services") then the regulation does not carry out the mandate of the Medicare statute and is invalid.

### Conclusion

For the reasons stated above, the defendant's motion to strike affidavits in Attachment C of the complaint is granted. Defendant's motion for summary judgment is denied. Plaintiff's motion for summary judgment is granted. The agency failed to provide an adequate basis and purpose statement. The regulation is arbitrary and capricious and does not comport with the requirements of the Medicare statute. The

matter is remanded to the Secretary for further consideration in accord with this opinion.