BETHESDA HOSPITAL, et al., Plaintiffs,

v.

Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.

No. C–1–83–622.

United States District Court, S.D. Ohio, W.D.

April 30, 1985.

Barbara Scott Bison, Robert S. Bromberg, Cincinnati, Ohio, Leonard C. Homer & Carel T. Hedlund (co-counsel), Margaret M. Manning, Baltimore, Md., for plaintiffs.

Donetta D. Wiethe, Asst. U.S. Atty., Cincinnati, Ohio, for defendant. ·

## MEMORANDUM OPINION

SPIEGEL, District Judge:

### INTRODUCTION

In this action, plaintiffs challenge the validity of an administrative regulation

governing reimbursement of malpractice insurance costs associated with the care of Medicare patients. The following issues are raised: 1) Whether the Provider Reimbursement Review Board (PRRB) erred in concluding that it lacked jurisdiction over the claims of plaintiffs who self-disallowed malpractice insurance costs? 2) Is the challenged regulation invalid under the Administrative Procedure Act (APA) because of deficiencies in either the Notice of Proposed Rule Making or the Basis and Purpose statement accompanying the regulation in final form? 3) Is the challenged regulation violative of the APA as arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law? 4) Is the challenged regulation invalid because it is inconsistent with the Medicare Act?

Having reviewed the administrative record and the filings by counsel, and having heard the able arguments of counsel, we reach the following conclusions: 1) The PRRB erred in concluding that it lacked jurisdiction over the claims of the health care providers who "self-disallowed" the malpractice insurance costs; 2) the challenged regulation is violative of the APA in two respects: a) the regulation in final form was not accompanied by an adequate statement of basis and purpose; and b) the issuance of the regulation, based upon the data on which the Secretary relied, was arbitrary and capricious. We do not rule on the issue of whether the challenged regulation is invalid because of alleged inconsistency with the Medicare Act.

## I. Factual Background

This case involves a challenge to the new method for reimbursement to health-care providers of malpractice insurance costs associated with the treatment of Medicare patients. The new Malpractice Rule was promulgated by the Department of Health and Human Services in 1979, and is codified at 42 C.F.R. § 405.452(b)(1)(ii) (1984).

The new Malpractice Rule is a marked departure from the previous method of calculating malpractice insurance costs associated with care of Medicare patients. The old approach lumped malpractice insurance costs into the category of General and Administrative costs (G & A costs). G & A costs include a variety of indirect costs associated with patient care. The old regulations provided for application of the provider's overall Medicare utilization ratio to allocate the G & A costs between Medicare and non-Medicare patients. The utilization ratio is the ratio of Medicare patients to the total patient population of the provider hospital.

The challenged regulation, specifically excepts malpractice insurance costs from the category of G & A costs, and thus, abandons the previous approach entirely. Malpractice insurance costs now constitute a separate category of health care costs. The extent to which Health and Human Services will reimburse the provider for malpractice insurance costs is "based on the dollar ratio of the provider's Medicare paid malpractice losses to its total paid malpractice losses for the current costs reporting period and the preceding 4-year period." 42 C.F.R. § 405.452(b)(1)(ii). If a provider has paid no malpractice claims within the applicable five-year period, it is reimbursed at the "national average" ratio of 5.1 per cent. This formula does not consider the Medicare utilization ratio of the provider.

Plaintiffs are providers of hospital services in the State of Ohio who mount this group challenge to the new Malpractice Rule. Of this group, all but two providers have undisputedly perfected their claim to judicial review in this Court. However, the Secretary seeks dismissal of the claims of Bethesda and Deaconess Hospitals, alleging, that this Court lacks jurisdiction over their claims (*see* docs. 37, 43). This jurisdictional issue is best addressed at the outset.

Plaintiffs Bethesda and Deaconess differ from other plaintiffs in that they did not file a claim with the fiscal intermediary [1]

---

**1.** The fiscal intermediary is a private entity which, under contract with the Department of

for reimbursement of malpractice insurance costs allowable under the old rule but now excludable under the new rule. Instead, Bethesda and Deaconess filed their cost reports with the fiscal intermediary in compliance with the new Malpractice Rule, and hence "self-disallowed" reimbursement for the additional portion of malpractice insurance costs allowable under the old rule. Consequently, the PRRB concluded that, under the statutory administrative review scheme, 42 U.S.C. § 1395oo(a)–(f), it lacked jurisdiction over their appeal from the final determination of the fiscal intermediary because Bethesda and Deaconess made no claim for reimbursement to the intermediary (doc. 43, attachment A).

## II. Jurisdictional Issues—"Self-disallowed Costs"

The relevant portions of the administrative review scheme are as follows:

> Any provider of services which has filed a required cost report within the time specified in regulations may obtain a hearing with respect to such cost report by a Provider Reimbursement Review Board (hereinafter referred to as the "Board") which shall be established by the Secretary in accordance with subsection (h) of this section and (except as provided in subsection (g)(2) of this section) any hospital which receives payments in amounts computed under subsection (b) or (d) of section 1395ww of this title and which has submitted such reports within such time as the Secretary may require in order to make payment under such section may obtain a hearing with respect to such payment by the Board, if—
>
> (1) such provider—
>
> (A)(i) is dissatisfied with a final determination of the organization serving as its fiscal intermediary pursuant to section 1395h of this title as to the amount of total program reimbursement due the provider for the items and services furnished to individuals for which payment may be made under this subchapter for the period covered by such report,
>
> \* \* \* \* \* \*
>
> (2) the amount in controversy is $10,000 or more, and
>
> (3) such provider files a request for a hearing within 180 days after notice of the intermediary's final determination under paragraph (1)(A)(i), or with respect to appeals under paragraph (1)(A)(ii), 180 days after notice of the Secretary's final determination, or with respect to appeals pursuant to paragraph (1)(B) or (C), within 180 days after notice of such determination would have been received if such determination had been made on a timely basis.

42 U.S.C. § 1395oo(a)(1)–(3).

> A decision by the Board shall be based upon the record made at such hearing, which shall include the evidence considered by the intermediary and such other evidence as may be obtained or received by the Board, and shall be supported by substantial evidence when the record is viewed as a whole. The Board shall have the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report (including revisions adverse to the provider of services) even though such matters were not considered by the intermediary in making such final determination.

42 U.S.C. § 1395oo(d).

■ The precise issue before us is whether the malpractice insurance costs disclosed on the cost reports by Bethesda and Deaconess but not claimed by those providers as reimbursable costs are "matters covered by such cost reports" over which the PRRB has jurisdiction to review within the meaning of § 1395oo(d).

As evident from the quoted provisions of the statute, section 1395oo contemplates

Health and Human Services, performs a major administrative role in the operation of the Medi-

care program. See discussion pp. 1367–1368 *infra.*

that the PRRB may conduct an administrative review of the intermediary's final decision. Perhaps less obvious but nevertheless evident is the legislative intent that the PRRB review need not be limited to costs claimed by the provider to the intermediary in the cost report. Consequently, we conclude that the PRRB erred in concluding that it lacked jurisdiction over the claims of Bethesda and Deaconess Hospitals.

The administrative review scheme contemplated by the statute is as follows: A cost report is submitted first to the fiscal intermediary. The fiscal intermediary determines reimbursement based upon the cost report. If the provider is dissatisfied with the final determination of the fiscal intermediary, and the amount in controversy is greater than or equal to $10,000.00, and the provider files a request for a hearing within 180 days, then the matter is properly subject to PRRB review. PRRB may then pass upon the final determination of the fiscal intermediary with respect to the cost report and make revisions on matters covered by the cost report.

■ A long established rule of statutory construction is that the words in the statute are to be given their ordinary and intended meaning. *See, e.g., Old Colony Ry. Co. v. Comm. of Internal Revenue*, 284 U.S. 552, 560, 52 S.Ct. 211, 213, 76 L.Ed. 484 (1932) and cases cited therein. Applying this principle to section 1395oo(d), a requirement of an overt claim for reimbursement to the fiscal intermediary as a condition precedent to PRRB review is implicit at best, and in apparent contradiction to the broad grant of authority to the PRRB to revise "matters covered by [the] cost report even though such matters were not considered by the intermediary in making such final determination." 42 U.S.C. § 1395oo(d). However, where case authority exists, we hesitate to base our decision exclusively upon the language of the statute.

Section 1395oo has engendered considerable litigation; however, in the interests of brevity and clarity of thought, we limit our discussion of the statute to the decisions of the Sixth, Seventh, and D.C. Circuit Courts of Appeal.

At issue in *St. Mary of Nazareth Hospital Center v. Department of Health and Human Services*, 698 F.2d 1337 (7th Cir. 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 107, 78 L.Ed.2d 110 (1983) (hereinafter *St. Mary* ) was whether personal telephones were "personal comfort items," and hence, whether costs associated with such phones were therefore not subject to reimbursement. *St. Mary* included the incidental issue of the PRRB's jurisdiction over claims of one provider who had "self-disallowed" the telephone costs. In a decision based largely upon the language of the statute the Seventh Circuit interpreted section 1395oo(d) as a broad grant of jurisdiction to the PRRB to "consider matters outside cost reports." 698 F.2d at 1337. Thus the Seventh Circuit concluded that the PRRB had jurisdiction over the self-disallowed costs and proceeded to the merits of the claim.

The Sixth Circuit has arguably taken a more restrictive view of the jurisdictional grant of authority to the PRRB contained in section 1395oo, at least where the costs claimed in the PRRB appeal were not included in the cost report in any fashion. In *Saline Community Hospital Association v. Secretary of Health and Human Services*, 744 F.2d 517 (6th Cir.1984), health care providers sought to amend their 1979 cost reports to add claims for return on net-invested-equity capital—costs which had never been included on the 1979 cost reports in any fashion. The PRRB denied jurisdiction. Judicial review at the district court level proceeded over two motions to dismiss, and the Secretary ultimately prevailed on the merits. On appeal, the Sixth Circuit held that the costs in issue were improperly tendered as amendments since the providers had never included them in the cost reports, and therefore, the PRRB was correct in denying jurisdiction. *Id.* at 520. The Court also held that the only issue properly before the district court was whether the PRRB erred in concluding that it lacked jurisdiction, and that the trial

court should not have reached the merits of the providers' claims. *Id.* at 521.

While instructive, *Saline* is not entirely on point. It is not a self-disallowance case. Therefore, it does not address the issue of the PRRB's jurisdiction over costs disclosed on the cost report but not actually claimed before the fiscal intermediary as reimbursable costs.

· We also have the benefit of two D.C. Circuit Court of Appeals decisions. *Athens Community Hospital, Inc. v. Schweiker,* 743 F.2d 1 (D.C.Cir.1984) (*Athens II*) modifying *Athens Community Hospital, Inc. v. Schweiker,* 686 F.2d 989 (D.C.Cir.1983) (*Athens II*). At issue in *Athens I and II* were a provider's claims for income tax costs and stock option costs associated with providing health care. Interpreting the stock option costs as matters not covered by the cost reports, and the income tax expenses as self-disallowed costs at best, the Court concluded that the PRRB was correct in concluding it had no jurisdiction because the intermediary was never given the opportunity to rule on the costs in issue. *Id.* at 10. In so holding, the Court through Judge Bork developed a useful, analytical construct for determining the breadth of the jurisdictional grant contained in section 1395oo(d).

Judge Bork views section 1395oo as containing two separate jurisdictional grants to the PRRB. First, it gives the PRRB the "power to affirm, modify or reverse final determinations of the fiscal intermediary with respect to the cost report." 42 U.S.C. § 1395oo(d). Second, PRRB is given the power "to make other revisions on matters covered by such cost report (including revisions adverse to the provider of services) even though such matters were not considered by the intermediary in making such final determination." *Id.* Satisfaction of either provision vests jurisdiction in the PRRB. 743 F.2d at 4.

The D.C. Circuit acknowledged the difficulty in reconciling these two jurisdictional grants and recognized that these grants permit of a variety of different readings. The Court thereafter suggested that these readings fall into three general categories. The first category contemplates that the PRRB has jurisdiction only over those costs specifically claimed for reimbursement in the cost report presented to the fiscal intermediary. The second category considers the PRRB's jurisdiction to extend to those items disclosed to the fiscal intermediary in or with the cost report. The third category views the PRRB's jurisdiction as covering matters not disclosed to the intermediary through the cost report, but asserted for the first time to the PRRB on appeal from the fiscal intermediary's final determination. *Id.* at 4–5.

It is readily apparent that the first and third categories do not admit to considerations of degree. The first category permits the PRRB to review only those items specifically claimed before the fiscal intermediary. The third category permits any costs to be claimed as reimbursable before the PRRB. One category is precisely limited, the other category is all inclusive. Neither requires further interpretation. In contrast, the middle category, focusing as it does on "disclosure," admits to a large degree of interpretation. Indeed, as the D.C. Circuit recognized, a disclosure rule might include a reasonableness standard which would include as adequately disclosed anything the fiscal intermediary reasonably should have known. 743 F.2d at 4–5.

Following this discussion, the D.C. Circuit suggested that

"the only ... way of reading the statute that does give effect to both clauses of section 1395oo(d) ... is to interpret the statute as allowing the PRRB to revise the aspects of the reimbursement calculation not actually contested by the provider, and possibly not considered by the intermediary (because not claimed for reimbursement by the provider), when such revision is necessary to accommodate other PRRB revisions of matters that were claimed by the provider, decided adversely by the intermediary, and then contested by the provider to the PRRB. The provider, however, is allowed to ap-

peal only such adverse decisions of the intermediary.

*Id.* at 9.

■ In effect, the D.C. Circuit has implemented a nexus requirement, limiting the PRRB's jurisdiction over those matters not specifically addressed by the fiscal intermediary to claims which are "necessary to accommodate" revisions of any claims specifically asserted before the fiscal intermediary. However, the D.C. Circuit did not endeavor to further define the nexus requirement.

We respectfully decline to adopt the D.C. Circuit's nexus test. There is no such nexus requirement in the language of the statute. Indeed, the parenthetical in the statute providing for "revisions adverse to the provider of the services" seems to be inconsistent with the nexus requirement. 42 U.S.C. § 1395oo(d). For if such a requirement existed, this paranthetical would necessarily be too broad. Under the nexus rule, the PRRB could make revisions adverse to the provider of the services only where such revisions were necessary to accomodate items specifically claimed before the fiscal intermediary. This reasoning is contrary to the language of the parenthetical, and could produce the anamolous result of the fiscal intermediary making an error in favor of the provider and an unrelated error in favor of the Secretary. On appeal of the adverse determination, the nexus rule would vest the PRRB with jurisdiction only over the error adverse to the provider, and the PRRB would have no power to correct the error made in favor of the provider, even though all facts and figures necessary to make such correction were included on the original cost report. We do not think that this result nor the reasoning which leads to this result reflects the intention of Congress in enacting this administrative review scheme.

Our conclusion is based in part on H.Rep. No. 92–231, *reprinted in* 1972 U.S.Code Cong. & Admin.News. 92nd Cong., 2d Sess., 4989, 5094–5095. In this report, Congress envisioned the review process as follows:

[A]ll decisions by the board [PRRB] would have to based upon the record made at such hearing [before the board], which may include any evidence submitted by the Department. Such evidence would include the evidence or record considered by the intermediary. Based upon examination of *all* the evidence, the Provider Reimbursement Review Board may find in whole or in part for the provider or the Government (*including a finding based upon the evidence before it that the provider owes sums in addition to the amount raised in the appeal*). (emphasis added)

It is clear from this parenthetical that Congress intended the PRRB to have the final say on reimbursable costs which were included in the evidence presented to the intermediary even if such costs were not specifically claimed as reimbursable and hence, not considered by the intermediary.

An examination of the role of the fiscal intermediary in the reimbursement process indicates that Congress naturally might have vested the PRRB with broad powers of review over intermediary determinations. Fiscal intermediaries were first designated in the Social Security Amendments of 1965, P.L. 89–97; 79 Stat. 286 *reprinted in* 1965 U.S.Code Cong. & Admin.News, 89th Cong. 1st Sess., 305. The legislative history of those amendments indicates that the fiscal intermediary was to perform a "major administrative role," as a private entity under contract with the administrative agency, in the administration of the Medicare program. The specific powers and responsibilities of the fiscal intermediary contemplated by Congress were to determine the amount of payments due providers upon presentation of the providers' claims and to make such payments; to serve as a conduit of information between the providers and the agency; and to provide consultative services; to assist providers to establish and maintain necessary records; and to assist providers in meeting the qualifications requirement for participation in the Medicare program. Intermediaries could also be employed to au-

dit provider records and to perform related functions. S.Rep. 404 *reprinted in* [1965] U.S.Code Cong. & Admin.News, 89th Cong. 1st Sess. pp. 1943, 1949, 1992–95. Although the 1972 amendments set up the administrative review scheme now under consideration (*see* p. 1367 *supra*), the 1972 amendments contained no indication of any major change in the function of fiscal intermediary. Thus the function of fiscal intermediary is and always has been that of an administrator, informational conduit, and auditor.

■ We acknowledge that some interpretation of agency regulations is implicit in the job of fiscal intermediary. But aside from such implicit interpretative power, the legislative history indicates no vesting of deliberative authority in the fiscal intermediary. Thus it is only natural that Congress would not envision the unchallenged determinations of the fiscal intermediary to be beyond review by the agency absent some connection with a challenged claim.

■ The absence of any large measure of deliberative authority in the fiscal intermediary's function undercuts the Secretary's argument in another respect. By arguing that the PRRB has no jurisdiction over claims which were not presented to the fiscal intermediary, the Secretary advances what is in essence an exhaustion of administrative remedies argument. On the facts of this case, requiring providers to submit the claims involved to the fiscal intermediary is particularly inappropriate. First, the malpractice rule requires no interpretation. Both the old and new rules are mathematically precise and submit easily to mechanical application. Second, the fiscal intermediary is not authorized to grant the relief sought. Plaintiffs here are not challenging the application of rule to particular facts. Rather, they challenge validity of the rule itself because of alleged illegality in its inception and its asserted inconsistency with the Medicare Act. We think it is clearly beyond the role of the fiscal intermediary, as a private agency operating under contract with the Department of Health and Human Services, to

review the legality of a regulation entrusted to it for application. Therefore, as "the exhaustion doctrine contemplates an efficacious remedy," *Humana of South Carolina, Inc. v. Califano*, 590 F.2d 1070, 1081 (D.C.Cir.1981), (quoting *Wallace v. Lynn*, 507 F.2d 1186, 1190 (D.C.Cir.1974) ), and the fiscal intermediary can provide no meaningful remedy on these facts, we will not infer an exhaustion of remedies requirement where none is explicitly stated by the statute or indicated appropriate by the legislative history.

Based upon the foregoing analysis, we conclude that the grant of authority to the PRRB to review determinations made by the fiscal intermediary contained in section 1395oo(d) is more appropriately limited to those items disclosed in the cost report such that all figures necessary to any calculations are contained in the cost report. Therefore, we conclude that the PRRB erred in concluding that it had no jurisdiction to review Bethesda and Deaconess Hospitals' claims for reimbursement of self-disallowed costs. However, that is the extent of our review. We do not proceed to the merits of plaintiffs' claims as regard Bethesda and Deaconess because of the clear instruction of *Saline*, 744 F.2d 517 at 521.

### III. The Validity of Malpractice Insurance Rule

#### (A) Additional Factual Background Necessary to a Decision on the Merits

The Notice of Proposed Rule Making (NPRM) was published on March 15, 1979, 44 Fed.Reg. 15,744. The NPRM indicated that a forty-five day period for public comment would be observed as a passage of the rule was being expedited for implementation in fiscal year 1979. *See* "Action Memorandum" Administrative Record Volume 1, Tab 28. This forty-five day comment period represented a departure from Executive Order 12044 which established a sixty day comment period for proposed reg-

ulations. 43 Fed.Reg. 12,661 (March 24, 1978).

The rule proposed in the NPRM was justified by an allusion to "a study conducted by an HEW consultant" which indicated that closed malpractice claims involving Medicare patients were generally lower than such claims involving non-Medicare patients. 44 Fed.Reg. 15,745. The NPRM contained no other justification for the agency's conclusion that Medicare was bearing a disproportionate share of malpractice insurance costs. The study mentioned was neither identified nor offered for public perusal. On May 1, 1979, the agency issued a notice reopening the comment period for an additional fifteen days, thereby bringing the notice in compliance with Executive Order 12044 *supra.* 44 Fed.Reg. 25,476.

On June 1, 1979, HEW published the final form of the regulation. 44 Fed.Reg. 31,641–42, codified at 42 C.F.R. § 405.-452(b)(1)(ii). The preamble to the final rule acknowledged that "all comments received were against proposal and recommended that [HEW] withdraw it entirely." 44 Fed. Reg. 31,641. There were approximately six hundred comments from interested parties in opposition to the regulation. Administrative Record Vols. 5–8.

The final form of the malpractice rule was published against the recommendation of the Deputy General Counsel for Regulation Review, Administrative Record Vol. 2, Tab 49, who noted that the preamble was inadequate and poorly written and cautioned that as all comments opposed the proposed regulation, there was a need for careful explanation of the rejection of such comments. *Id.* However, other than acknowledging that all comments received were against the proposed regulation, the agency did not address such comments in significant detail when promulgating the rule in final form. 44 Fed.Reg. 31,641–42.

The study alluded to in the NPRM was identified in the final rule as the Medical Malpractice Closed Claim Study, 1976 performed by Westat, Inc. (hereinafter Westat study). The Westat study consisted of an analysis of malpractice claims closed by nine companies during a four month period in 1976. Administrative Record Vol. 3 at 1–2, 1–3 & 2–1. The authors of the study noted that it was not the purpose of the study to make national yearly estimates. Administrative Record Vol. 3 at 2–5. The study was a census and not a representative sample. *Id.* at 2–9. Specifically, the authors warned that "conclusions must be drawn very cautiously because of the possibility of biased data." *Id.* at 2–3. Also, the authors acknowledged the limitation of the study due to the exclusion of self-insurers. *Id.*

Other weaknesses in the study were documented in the author's summary. Administrative Record Vol. 4, Tab 37. Because of the sample design, the authors concluded that it was "virtually impossible to generalize beyond the sample to annual totals or to national totals ..." and that there was "no assurance that the sample was in any way representative of hospitals, of physicians, of injuries of geographic regions, of claimants." *Id.* While the plaintiffs' criticisms of the statistical validity of Westat study go far beyond those listed above, we do not address them as those heretofore discussed are sufficient for our decision.

**(B) Procedural Challenges**

Plaintiffs challenge the malpractice rule both procedurally and substantively. The procedural challenges are based upon the Administrative Procedure Act, Title 5 U.S.C. §§ 551 *et seq.,* §§ 701 *et seq.* The standard for judicial review of the validity of an administrative regulation is whether the Secretary complied with the necessary procedural requirements in promulgating the rule, whether the Secretary acted within the scope of her statutory power, and whether the choice was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416–17, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). However, the "court is not empowered to substitute its judgment

for that of the agency." *Id.* at 416, 91 S.Ct. at 823. Nevertheless, judicial deference to the agency's judgment in implementing congressionally enacted statutory policies "cannot be allowed to slip into judicial inertia." *Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Authority,* 464 U.S. 89, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983), (quoting *American Ship Building Co. v. N.L.R.B.,* 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965)), and Courts "are not obliged to stand aside and rubber stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). Finally, "if Congress established a presumption from which judicial review should start, that presumption ... [is] *against* changes in current policy that are not justified by the rule making record." *Motor Vehicle Manufacturer's Ass'n of the United States, Inc. v. State Farm Automobile Insurance Company,* 463 U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (emphasis in original). Such is the standard as set forth by Judge Will in *St. James Hospital v. Heckler,* 579 F.Supp. 757, 763 (N.D.Ill.1984) with which we concur.

### 1. *Adequacy of the NPRM*

■ We first address the adequacy of the NPRM. The APA requires public notice of an agency's intention to issue a regulation. A notice must be "sufficient to fairly apprise interested parties of all significant subjects and issues involved." *American Iron and Steel Institute v. EPA,* 568 F.2d 284, 291 (3d Cir.1977), (citing S.Rep. No. 752, 79th Cong., 1st Sess. at 16 (1945)). Notice provisions are intended to provide the opportunity for public participation in the rule making process, *Buckeye Power, Inc. v. EPA,* 481 F.2d 162, 170 (6th Cir.1973), *cert. denied, sub nom. Tennessee Valley Authority v. EPA,* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976), and to inspire agency self-education prior to actual rule making. *American Iron,*

568 F.2d at 291. Notice is also valuable because it develops the record of agency decision-making and hence facilitates judicial review. *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 (D.C.Cir.1977), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Notice is most valuable when it discloses the data upon which the agency proposes the rule. *Connecticut Light and Power Company v. Nuclear Regulatory Commission,* 673 F.2d 525, 530–31 (D.C.Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982). *Cf. United States Lines v. Federal Maritime Commission,* 584 F.2d 519 (D.C.Cir.1978).

■ From examination of the NPRM at issue here, the agency is in technical non-compliance because of the failure to identify the data upon which it relied—(*i.e.,* the Westat study or any other data for that matter). However, the rule making record indicates that the Westat study reached health care professionals in sufficient number in time to permit development of the rule making record. The Westat study is discussed in detail in the rule making record, and therefore, we will not declare the rule invalid because of this technical non-compliance.

### 2. *Adequacy of the basis and purpose statement*

■ We turn next to the adequacy of the basis and purpose statement which accompanied the rule in its final form. A basis and purpose statement is required by 5 U.S.C. § 553(c). *Sierra Club v. Gorsuch,* 715 F.2d 653, 658 n. 31 (D.C.Cir.1983). Section 553(c) provides in pertinent part:

> After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

The basis and purpose statement need not be an exhaustive discussion of comments to the agency. *Automotive Parts and Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C.Cir.1968). However, the agency must "respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution lead the agency to the ultimate action." *Action on Smoking and Health v. C.A.B.*, 699 F.2d 1209, 1216 (D.C.Cir.1983) (quoting *Rodway v. U.S. Department of Agriculture*, 514 F.2d 809, 817 (D.C.Cir. 1975)). Ultimately, "the detail required in a statement of the basis and purpose depends upon the subject of regulation and the nature of the comments received." *Action on Smoking and Health*, 699 F.2d at 1216.

In the instant case, the subject of regulation is a rule by which health care providers are reimbursed for malpractice insurance costs. This regulation has considerable economic impact and represents a significant change from previous agency policy. While we do not question the Secretary's authority to depart radically from existing policy, we note that there is a presumption against such changes, unless they are supported by the rule making record. *Motor Vehicle Manufacturers*, 103 S.Ct. at 2866. This presumption requires the Secretary or Agency to respond in significant detail to serious comments opposing the proposed regulations. Here, we do not view the agency's response as sufficient. On this point we agree with Judge Fullam of the Eastern District of Pennsylvania who stated:

> It would have been a miracle of bureaucratic succinctness had the Secretary managed to reply adequately in two scant columns of Federal Register prose to the six hundred plus comments that occupy five thick volumes of the administrative record. Unfortunately no such miracle has been witnessed by this court.

*Abington Memorial Hospital v. Heckler*, 576 F.Supp. 1081, 1085–86 (E.D.P.A.1983) *aff'd* 750 F.2d 242 (3d Cir.1984).

More disturbing than the brevity of the basis and purpose statement is the content. As Judge Fullam noted, the American Hospital Association and the Hospital Corporation of America, among other commenters, questioned the statistical validity of the Westat study which was the only objective data upon which the regulation was based. *See* Administrative Record Vol. 5, (no tab) p. 9; and Vol. 6 (no tab) p. 5. The preamble to the final rule neither acknowledges nor responds to these criticisms. *See* 576 F.Supp. 1086. Again, as noted by Judge Fullam, the comments included contentions that malpractice insurance costs were not necessarily reflected by claims payments, however, these comments were not addressed by the agency in promulgating the final rule either. *Id.*

In sum, we conclude that the agency has neither responded in a reasoned manner to comments received nor explained how it resolved significant problems raised by these comments. Rather, we are left with the impression that the agency evaded the most significant problems raised by the comments, *i.e.*, the statistical challenges to the Westat study and the use of the Westat study for purposes other than those for which it was intended. The conclusion is inescapable that the agency violated the APA in failing to include an adequate basis and purpose statement with the regulation in its final form.

### 3. *Abuse of Discretion*

 Plaintiffs also challenge the new malpractice rule under 5 U.S.C. § 706(2)(A). That statute provides that a reviewing court may set aside agency action when found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* In short, plaintiffs contend that the Secretary's action in promulgating the new malpractice rule was arbitrary and capricious. The standard of review under section 706(2)(A) has recently been stated as "whether the decision was based upon a consideration of the relevant factors and whether there had been a clear error of judgment." *Motor*

*Vehicle Manufacturers Ass'n,* 463 U.S. 29, 103 S.Ct. 2856, 2865, 2867, 77 L.Ed.2d 443 (1983). The reviewing court should not second guess the agency on technical matters but should "set aside administrative rules for which the record ... demonstrates a lack of rational basis." *PPG Industries v. Costle,* 630 F.2d 462, 465 (6th Cir.1980). Reliance on flawed data.is properly considered a clear error in judgment at least where the flaws are known to the agency prior to promulgation of the final rule. *Almay, Inc. v. Califano,* 569 F.2d 674 (D.C.Cir.1977).

In this case we think it is clear that the Secretary relied on flawed data in promulgating the new malpractice rule. The authors of the Westat report stated that "conclusions must be drawn very cautiously because of the possibility of biased data." Administrative Record Vol. 3 at 2–2. Also, in a memorandum to the HEW project officer in charge of the medical malpractice study, the Westat senior analyst stated that it is "virtually impossible to generalize beyond the sample ... to annual totals or to national totals...." Beyond that there was no assurance that the sample was in any way representative of [hospitals], of physicians, of injuries, of geographic regions, of claimants. Administrative Record Vol. 4, Tab 37. Given these comments by the authors and the fact that the Secretary then used the Westat study as a basis for implementing the regulation, and, extrapolated from the study the "national average" of 5.1%, it is abundantly clear that the agency proceeded to use the Westat study in the very manner the authors cautioned against. Under such circumstances we have no hesitation in holding the implementation of the new Medicare malpractice reimbursement rule a clear error of judgment.

**(C) Substantive Challenge**

We do not decide whether the new malpractice rule is in violation of the substantive provisions of the Medicare Act as plaintiffs contend. As the procedural issues are dispositive, it is unnecessary for us to reach this issue. Furthermore, we do not presume to determine any inconsistency based on what we view as the significantly flawed factual basis upon which the agency premised the challenged rule.

**IV. Conclusion**

We recognize that deferential consideration should be given regulations promulgated by the Secretary, and that courts should be cautious to overturn such regulations. *NLRB v. Bell Aerospace Co. Division of Textron, Inc.,* 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–62, 40 L.Ed.2d 134 (1974). Having exercised that caution, we must nevertheless invalidate the regulation challenged in this action. We note that in holding the regulation invalid we are in accordance with the considerable weight of authority.[2]

2. The new Medicare Malpractice Reimbursement Rule has been invalidated in at least eighteen cases. *Arkansas Methodist Hospital v. Heckler,* 597 F.Supp. 238 (E.D.Ark.1984); *East Jefferson General Hospital v. Heckler,* Slip Op. 83–4107–C (E.D.La. Oct. 19, 1984); *St. Anthony Regional Hospital v. Heckler,* No. C84–37, 613 F.Supp. 23 (N.D.Iowa Oct. 12, 1984); *Parkway Medical Center v. Heckler,* Slip. Op. 83–1700 (S.D. Fla. Sept. 24, 1984); *Mercy Medical Center v. Heckler,* No. 3–82 Civ. 1724 (D.Minn. Aug. 17, 1984); *Menorah Medical Center v. Heckler,* No. 83–0822–CV–W–4 (W.D.Mo. July 26, 1984); *Metropolitan Hospital, Inc. v. Heckler,* Slip Op. C–83–502–A (N.D.Ga. June 25, 1984); *DeSoto General Hospital v. Heckler,* Civil Action 83–1050–B (M.D. La. June 20, 1984); *Alexandria Hospital v. Heckler,* 586 F.Supp. 581 (E.D.Va.1984); *St. Joseph's Hospital, Tucson v. Heckler,* Slip Op. 82–781

(D.Ariz. April 24, 1984); *Lloyd Noland Hospital and Clinic v. Heckler,* Slip Op. CV–83–PT–0868–S (N.D.Ala. April 5, 1984); *Bedford County Memorial Hospital v. Heckler,* 583 F.Supp. 367 (W.D.Va. 1984); *Humana of Illinois, Inc.,* 584 F.Supp. 618 (C.D.Ill.1984), *aff'd,* 760 F.2d 1460 (7th Cir.1985); *Albany General Hospital v. Heckler,* 584 F.Supp. 614 (D.C.Or.1984), *appeal docketed,* No. 84–3865 (9th Cir. June 6, 1984); *St. James Hospital v. Heckler,* 579 F.Supp. 757 (N.D.Ill.1984); *Chelsea Community Hospital v. Heckler,* Slip Op. 83 CV–6126–AA (E.D.Mich. Dec. 20, 1983); *Mt. Carmel Mercy Hospital v. Heckler,* 581 F.Supp. 1311 (E.D. Mich.1983); *Abington Memorial Hospital v. Heckler,* 576 F.Supp. 1081 (E.D.Pa.1983) *aff'd* 750 F.2d 252 (3d Cir.1984).

To our knowledge, the malpractice rule has been upheld in four cases. *Humana of Aurora, Inc. v. Heckler,* No. 83–7–70 (D.Colo. Sept. 19,

In accordance with the foregoing, plaintiffs' motion for summary judgment is hereby granted and defendant's motion for summary judgment is hereby denied. The parties will brief the issues of the appropriateness of relief according to the normal briefing schedule set out by the local rules of this Court. Plaintiffs' brief is due within thirty days of the date of this Order.

SO ORDERED.

1983), *rev'd and remd'd,* 753 F.2d 1579 (10th Cir.1985); *Walter O. Boswell Memorial Hospital v. Heckler,* 573 F.Supp. 884 (D.D.C.1983) *rev'd and remd'd,* 749 F.2d 788 (D.C.Cir.1984); *Cumberland Medical Center v. Heckler,* 578 F.Supp. 39 (M.D.Tenn.1983) *appeal docketed,* No. 83–5549 (6th Cir. Aug. 9, 1983); *Athens Community Hospital v. Heckler,* 565 F.Supp. 695 (C.D.Tenn. 1983), *appeal docketed,* No. 83–5546 (6th Cir. Aug. 5, 1983). As reflected by the subsequent history above, two of these four cases have been reversed and remanded.