OPINION OF THE COURT
D. Bruce Crew, III, J.
In this action, plaintiff, a New York not-for-profit corporation which operates a voluntary nonprofit hospital, challenges the constitutionality of Public Health Law § 2807-a (9) (as added by L 1985, ch 807, eff Jan. 1, 1986). In general terms this subdivision makes provision for the creation of a Statewide bad debt and charity care pool funded by an assessment upon the actual Medicare revenues which are realized by the hospitals in the State. The plaintiff maintains the law is unconstitutional on three grounds. First, plaintiff maintains that the law is a discriminatory assessment against the Federal Government and those with whom it does business in violation of the supremacy clause of the US Constitution (art VI, cl 2). Second, it argues that Federal Medicare legislation has preempted the field that New York seeks to regulate via that law. Third, plaintiff contends that the law also deprives it of equal protection of the law in violation of the US Constitution 14th Amendment and NY Constitution, article I, § 11. The plaintiff has moved for summary judgment and the defendant has cross-moved for summary judgment. While the parties agree that there are no material issues of fact to be decided, it is necessary to outline the rather complex hospital reimbursement system of New York State, as well as the Federal Medicare system, and how the two interrelate before addressing the legal arguments.
Hospitals in New York State receive revenue for inpatient services from Medicare, Blue Cross, Medicaid, and private charge payors. Prior to 1983 Medicaid and Blue Cross reimbursement rates were controlled by the State, whereas rate setting for the Medicare program was controlled by the Federal Government. Beginning in 1983, and extending through 1985, a restructured system of hospital reimbursement was instituted by the State of New York. The restructured system was called the New York Prospective Hospital Reimbursement Methodology, or NYPHRM, and functioned to set the reimbursement rates for all payors, including Medicare. The State accomplished the latter by obtaining a waiver from the Federal Government assigning to the State responsibility for determining Medicare rates (see, 42 USC § 1395b-1 [b]). Cen *781 tral to the ultimate issue in this case is that NYPHRM contained provisions for dealing with bad debt and charity care revenue shortfalls, allocating responsibility equitably among all the payors in the system.[1] To accomplish that, a factor was added to the reimbursement rate for all payors equalling 2% of reimbursable costs in 1983, 3% in 1984, and 4% in 1985 (Public Health Law § 2808-c [4], former § 2807-a [4]). The funds raised were then pooled regionally and redistributed to aid hospitals experiencing deficits caused by bad debt and charity care (Public Health Law § 2808-c [9], former § 2807-a [9]).
NYPHRM expired at the end of 1985 and has been replaced by NYPHRM II (Public Health Law § 2807-a). The hospital reimbursement rate methodology adopted for use in 1986 and 1987 is not applicable to Medicare, because the Federal waiver expired at the end of 1985 and a new waiver was not sought. Consequently, as of January 1, 1986, Medicare reimbursement rates are set by the Federal Government thereby preventing the State from adding a bad debt and charity care factor to Medicare rates. To accommodate this inability NYPHRM II sets up two distinct assessment systems to raise funds for bad debt and charity care. The statute establishes regional pools funded by a 4V¿% assessment of allowable operating costs excluding inpatient costs related to beneficiaries of Medicare and inpatient uncollectible amounts (Public Health Law § 2807-a [8] [e]; § 2807-a [15]). The law provides for an adjustment to the reimbursement rates equal to said assessment so that the hospital can pass this assessment on to the non-Medicare payors. The moneys thus generated are distributed to cover bad debt and charity care needs (Public Health Law § 2807-a [16]). This assessment system has no impact on a hospital’s Medicare revenues.
The statute establishes a second system which provides for an equivalent contribution to bad debt and charity care based upon Medicare revenues. Under this system, voluntary nonprofit hospitals, such as the plaintiff, and private proprietary hospitals are assessed 4Vi% of actual Medicare revenues for 1986, "excluding revenues reflecting reimbursement for capital related inpatient expenses and revenues received for return on equity for private proprietary general hospitals” *782 (Public Health Law § 2807-a [9]).[2] Moneys thus generated are distributed to fund whatever unmet need there is for bad debt and charity care after distribution of the regional pool moneys (Public Health Law § 2807-a [17]). It is this assessment which the plaintiff is challenging.
Medicare is a 100% Federally funded program which provides funds for the medical care of certain delineated groups of people (42 USC §§ 1395c, 1395o). The Medicare legislation directs the Secretary of Health and Human Services to establish reimbursement rates for the care of such persons (42 USC § 1395ww [d] [2]). The statutory reimbursement rate is generally the "reasonable” cost of such services.[3] Reasonable cost is defined in 42 USC § 1395x (v), which in pertinent part reads as follows: "(1) (A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services * * * Such regulations shall (i) take into account both direct and indirect costs of providers of services * * * in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this title will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs” (emphasis added). The regulations promulgated by the Secretary reiterate the rule, hereinafter referred to as the prohibition against cross subsidization, that in determining reasonable cost the "costs of covered services furnished beneficiaries are not to be borne by individuals not covered by the health insurance program, and conversely, costs of services provided for other than beneficiaries are not to be borne by the health insurance program” (42 CFR 405.420 [d]). Additionally, "[b]ad debts, charity, and courtesy allowances are deductions from revenue and are not to be *783 included in allowable cost; however, bad debts attributable to the deductibles and coinsurance amounts are reimbursable under the program” (42 CFR 405.420 [a]). The Secretary is directed to calculate the amount of payments that may be made to a provider of covered services, and to make certain exceptions and adjustments (42 USC § 1395ww). Most importantly, the Secretary "shall provide for such exceptions and adjustments to the payment amounts * * * as the Secretary deems appropriate to take into account the special needs * * * of public or other hospitals that serve a significantly disproportionate number of patients who have low income or are entitled to benefits under part A of this title” (42 USC § 1395ww [d] [5] [C] [i]).[4]
Proceeding directly to plaintiff’s second cause of action the court must decide whether the Federal Medicare legislation outlined above has preempted the field that Public Health Law § 2807-a (9) seeks to regulate.
The preemption doctrine has its roots in the supremacy clause of the US Constitution (art VI, cl 2).[5] Federal law may be held to preempt State law in three different ways. First, "when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms” (Hillsborough County v Automated Med. Labs., 471 US —, —, 85 L ed 2d 714, 721; Pacific Gas & Elec. Co. v Energy Resources Commn., 461 US 190, 203; Jones v Rath Packing Co., 430 US 519, 525). The Medicare statute contains no provisions expressly preempting State law from regulating the health services field in general, or from regulating and providing for bad debt and charity care in particular. Second, where Congress fails to state its intent, an "intent to preempt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make rea *784 sonable the inference that Congress left no room’ for supplementary state regulation” (Hillsborough County v Automated Med. Labs, supra, at p —, at p 721; Rice v Santa Fe Elevator Corp., 331 US 218, 230), or "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject” (Rice v Santa Fe Elevator Corp., supra, at p 230; Pacific Gas & Elec. Co. v Energy Resources Commn., supra, at p 204). In the case at bar, to the extent that plaintiff is arguing for preemption based on pervasive Federal regulation of the field of health care delivery to Medicare patients its argument is too broad. As defendant correctly points out, there is a strong presumption "that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause” (Hillsborough County v Automated Med. Labs, supra, at p 722; Rebaldo v Cuomo, 749 F2d 133, 138). Indeed, the Medicare legislation strongly suggests that Federal regulation of health care services for Medicare recipients was meant to compliment, not exclude State regulation of health services.[6]
It is the third branch of the preemption doctrine that is at issue in this case, which for convenience might be labeled inferred specific preemption. Justice White has concisely defined this concept: "Even where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law. Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,’ Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 (1963), or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.’ Hines v. Davidowitz, 312 U.S. 52, 67 (1941)” (Pacific Gas & Elec. Co. v Energy Resources Commn., supra, at p 204). It should be noted, however, that with regard to this branch of the doctrine, a strong presumption remains against preemption since a State’s authority to regulate hospital costs "should not be superseded by federal regulations unless that was the clear intent of Congress” (Rebaldo v Cuomo, supra, at p 138; Alessi v Raybestos-Manhattan, 451 US 504, 522). Moreover, it has been repeatedly emphasized that "[congressional *785 intent to preempt state laws is not to be lightly inferred” (Health Care Plan of N. J. v Schweiker, 553 F Supp 440, 446; Merrill Lynch, Pierce, Fenner & Smith v Ware, 414 US 117, 127). Mindful of the foregoing, the court is of the opinion that Public Health Law § 2807-a (9) actually conflicts with Federal Medicare legislation in two crucial and determinative respects.
First, Congress has directed the Secretary to make adjustments to Medicare payments for certain disproportionate share hospitals, in effect making provision for their bad debt and charity care problems. Under Public Health Law § 2807-a (9) a percentage of Medicare revenues coming to New York hospitals are redirected to effectuate the same purpose, albeit according to New York’s perception of the problem. This effectively frustrates the clear intent of Congress to deal with this problem by its own comprehensive scheme of allocation of Medicare revenues.
Once reasonable cost is determined under the Federal payment system, the Secretary has been directed to provide for exceptions and adjustments to the payment amounts "to take into account the special needs * * * of public or other hospitals that serve a significantly disproportionate number of patients who have low income or are entitled to benefits under part A of this title” (42 USC § 1395ww [d] [5] [C] [i]). If there need be any further evidence of the intent of Congress to address this issue it should be noted that both Houses have been considering legislation which would provide disproportionate share hospitals with additional payments for fiscal years 1986 and 1987 (HR 3128; S 1730).[7] The report in support of that legislation observes that Congress is concerned that many disproportionate share hospitals have extra overhead costs for they "must care for significant numbers of high-cost, uninsured patients who are ‘dumped’ by other hospitals for economic reasons” (Report on Medicare and Medicaid Budget Reconciliation Amendments of 1985, No. 265 [Sept. 11, 1985]). This is the same bad debt and charity care problem that the New York statute seeks to address. New York has the authority to deal with this problem as it falls within the traditional State power to regulate the cost of health care. However, that authority does not permit reallocation of Medicare funds *786 already distributed in a manner contemplated to meet those needs.
An analogous situation was recently before the Supreme Court in the case of Lawrence County v Lead-Deadwood School Dist. (469 US 256). In that case a Federal statute required the Federal Government to compensate local governments for loss of tax revenues resulting from the tax immune status of Federal lands located in their jurisdictions. The Federal statute provided that the local governments could use these payments in lieu of taxes for any governmental purpose. The State statute in that case required local governments to distribute Federal payments in lieu of taxes in same manner manner as they distribute tax revenues contary to the " 'any governmental purpose’ ” (469 US, at p 258, citing 31 USC § 6902 [a]) clause in the Federal statute. The Supreme Court found that it was the intent of Congress to leave the discretion as to how to spend the funds with the local governments and, therefore, the State statute was preempted, because "[i]f the State may dictate a 'plan’ of distribution * * * it may impose exactly the kinds of restrictions on the use of funds that Congress intended to prohibit” (Lawrence County v Lead-Deadwood School Dist., 469 US, at p 264). In short, once it was concluded that Congress had a specific intent to allow the local governments to decide how to put the Federal funds to use, any State plan was found to be preempted. Similarly, in the case at bar, having found a specific congressional intent to distribute Medicare funds so as to deal with bad debt and charity, any State plan altering that distribution is preempted.
Second, even if it can be said that the Medicare legislation did not preempt the State’s power to reallocate Medicare revenues for bad debt and charity care purposes, the Federal Medicare legislation explicitly provides that there will be no cross subsidization in determining reasonable cost (42 USC § 1395x [v] [1] [A]; see, 42 CFR 405.420 [d]). This goal is totally frustrated by Public Health Law § 2807-a (9) which redirects a percentage of Medicare revenues to service the bad debt and charity care revenue shortfall created, to a large extent, by non-Medicare patients.
The prohibition against cross subsidization is a central concept of the Medicare system. The plaintiff emphasizes this by relying heavily on an analysis of the problem of whether charity care costs incurred as part of a hospital’s Hill-Burton *787 obligations were reimbursable under Medicare. Without going into great detail, suffice it to say that the real issue raised in the cases cited by plaintiff was not whether cross subsidization was occurring, but whether the cost of free care was an indirect cost incurred for the benefit of all the patients of the hospital and reimbursable as an indirect reasonable cost (42 USC § 1395x [v] [1] [A]; Presbyterian Hosp. of Dallas v Harris, 638 F2d 1381, 1386). However, even in those cases where the cost of free care was held to be a reimbursable indirect cost it is significant that only a percentage of it was reimbursable, in keeping with the prohibition against cross subsidization.[8]
Cross subsidization was more directly in issue in St. James Hosp. v Heckler (579 F Supp 757, affd 760 F2d 1460, cert denied — US —, 88 L ed 2d 228) and Abington Mem. Hosp. v Heckler (576 F Supp 1081, affd 750 F2d 242, cert denied — US —, 88 L ed 2d 149). In those cases providers of services under Medicare challenged a regulation of the Secretary which altered the computation formula used to reimburse provider hospitals for the cost of malpractice insurance. The prior formula reimbursed hospitals for the cost of malpractice insurance based upon the ratio of Medicare patient use of the hospital services to total patient use. The challenged regulation reimbursed hospitals for malpractice insurance cost based upon the ratio between malpractice claims paid on account of Medicare patients and claims paid on account of non-Medicare patients. The issue was whether or not cross subsidization was occurring. The Abington court concluded: "The statute plainly requires that indirect costs be allocated so as to ensure that non-Medicare patients do not bear costs attributable to Medicare patients, and vice-versa * * * [Reasonable estimates and extrapolations are certainly permissible; mathematical precision is not to be expected. But this does not mean that the Secretary is free to choose an allocation formula which is least likely to reflect reality — indeed, as in this case, a formula which seemingly guarantees that the statutory mandate will inevitably be violated in most cases” (Abington Mem. Hosp. v Heckler, supra, at p 1089). Although other Federal courts have reached a different conclusion as to whether or not the princi *788 pie of cross subsidization is violated by the malpractice regulation, they recognized that the Secretary must comply with the principle (e.g., Athens Community Hosp. v Heckler, 565 F Supp 695; Boswell Mem. Hosp. v Heckler, 573 F Supp 884). In short the Secretary, in determining statutory reasonable cost, cannot cross-subsidize whether the cost is direct or indirect. Under the State statute Federal Medicare funds cover non-Medicare patients’ bad debts and charity care. The fact that the actor is the State and not the Secretary is of no consequence; in the end this specific prohibition against a use of Federal moneys is just as assuredly defeated.[9] Assuming, therefore, that the State may constitutionally redirect Medicare revenues to alleviate the bad debt and charity care problem, it may not do so in a manner that violates the prohibition against cross subsidization and the present New York scheme contains no provision protecting against that eventuality.[10]
For the foregoing reasons Public Health Law § 2807-a (9) "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress” (Hines v Davidowitz, 312 US 52, 67) and is constitutionally infirm.
Plaintiff has also moved for summary judgment on its fourth cause of action, seeking an award of an attorney’s fee pursuant to 42 USC § 1983. It has been held that a State court, adjudicating what is in effect a section 1983 suit for an injunction against a State’s enforcement of an unconstitutional law, is authorized to award an attorney’s fee (Matter of Ashley v Curtis, 67 AD2d 828; Young v Toia, 66 AD2d 377). Having found a constitutional violation, the matter of a *789 statutory attorney’s fee lies within the sound discretion of the court. However, the prevailing party " 'should ordinarily recover an attorney’s fee unless special circumstances would render such an award unjust’ ” (Ashley v Curtis, supra, at p 829, citing Christianburg Garment Co. v Equal Employment Opportunity Commn., 434 US 412, 416-417). The court does not find, nor has the defendant asserted, any special circumstances which would militate against such an award. Therefore, the court finds that this is an appropriate case in which to grant an attorney’s fee and orders an immediate trial to determine the amount to be awarded (CPLR 3212 [c]).

. These shortfalls occur because a sizeable proportion of uninsured, or partially insured, charge-paying patients cannot pay their hospital bills (NYPHRM, pamphlet issued by NYS Dept of Health, at 176 [Apr. 1983]).

. Major public hospitals are assessed 214%, other public hospitals are assessed 4%, and there is no assessment for financially distressed hospitals (Public Health Law § 2807-a [9] [b], [c], [d]).

. Specifically, "the lesser of (A) the reasonable cost of such services, as determined under [42 USC §] 1395x (v) and as further limited by [42 USC §] 1395rr (b) (2) (B), or (B) the customary charges with respect to such services” (42 USC § 1395f [b] [1]).

. The Secretary has been slow to promulgate a definition of disproportionate share hospitals despite pressure from Congress and the courts. However, on December 31, 1985 the Health Care Financing Administration, a division of the Department of Health and Human Services, published a definition in the Federal Register. The Hospital Association of New York State (HANYS) has estimated that only two New York hospitals quality as disproportionate share hospitals, eligible for an adjustment to their Medicare payment rates (18 News [No. 2], published by HANYS [Jan. 15, 1986]).

. "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding.”

. "Nothing contained in this title shall be construed to preclude any State from providing, or any individual from purchasing or otherwise securing, protection against the cost of any health services” (42 USC § 1395b; see also, 42 USC § 1395).

. HR 3128 was approved by Congress on March 20, 1986 and awaits the President’s signature (Medicare & Medicaid Guide [CCH], No. 488 [Apr. 3, 1986]).

. "We conclude, therefore, that the free care expenses incurred by the Hospital in connection with its obligations under the Hill-Burton Act were reasonable costs of providing care to all of its patients, including medicare patients, and are consequently reimbursable to the extent that this indirect cost benefited medicare patients” (Presbyterian Hosp. of Dallas v Harris, 638 F2d 1381, 1387).

. To a certain extent the adjustment for disproportionate share hospitals would appear to violate the prohibition against cross subsidization, for low income patients attributing to rising costs are at least in part not covered by Medicare. However, here Congress itself is specifically providing for relief from inequities left unaddressed by a strict adherence to the prohibition against cross subsidization. Congress, the promulgatory of the principle can dictate an exception to it but the Secretary cannot, nor can the States.

. It is noteworthy that during 1983-1985, when New York set the Medicare rates, Medicare’s contribution to the bad debt and charity care pools was limited by a condition of the Federal waiver requiring that "Medicare’s share of bad debt and charity care will be limited to the ratio of Medicare inpatient charges to total inpatient and outpatient charges” with "[a]ny shortfall created by this provision * * * made up by the other major payors, Medicaid and Blue Cross”, thereby protecting against cross subsidization (NYPHRM, pamphlet issued by NYS Dept of Health, at 176, 178 [Apr. 1983]).