ARNOT-OGDEN MEMORIAL HOSPITAL, Respondent, v DAVID B. AXELROD, as Commissioner of Health of the State of New York, Appellant.

Third Department, June 11, 1987

**APPEARANCES OF COUNSEL**

*Robert Abrams, Attorney-General (Michael S. Buskus* and *Peter H. Schiff* of counsel), for appellant.

*Sayles, Evans, Brayton, Palmer & Tifft (Edward B. Hoffman* of counsel), for respondent.

**OPINION OF THE COURT**

LEVINE, J.

Defendant appeals from plaintiff's successful challenge at Special Term (131 Misc 2d 779) to the constitutionality of Public Health Law § 2807-a (former [9]) (as added by L 1985, ch 807, § 4, eff Jan. 1, 1986, repealed by L 1986, ch 272, § 1, eff July 8, 1986). That legislation provided, *inter alia,* for the imposition of an assessment of 4.5% on revenues for in-patient services to Medicare patients received by voluntary nonprofit hospitals, such as plaintiff, and by private proprietary hospitals. The moneys thus collected provide a pool of funding for reimbursement of hospitals who suffer inordinate losses in serving indigent and uninsured patients, known as "bad debt and charity care" (BDCC).

Hospitals in New York, including plaintiff, receive revenues for in-patient services from four primary sources: Medicare (approximately 45%), Blue Cross (approximately 25%), Medicaid (approximately 20%) and private charge payors, i.e., self-

pay patients and those with commercial insurance (approximately 10%). For many years, both the State and the Federal Governments have struggled with the inflationary effects of sharply escalating costs of hospital care and have attempted to exercise control over the problem by regulation of reimbursement rates for the revenue sources over which they had authority. Well before 1983 *(see,* L 1969, ch 957) the State had begun instituting a system of prospective calculation of reimbursement rates for Blue Cross and Medicaid payments, with no recovery for a hospital's actual cost in excess of the established rates, as "both compulsion and an incentive [for hospitals] to control costs of operation" *(Matter of Beekman-Downtown Hosp. v Whalen,* 44 NY2d 124, 128). The Federal Government in its Medicare program for the elderly and disabled, however, continued to reimburse retrospectively on the basis of actual (reasonable) costs until 1983.

In 1983, Congress also adopted a prospective payment system (PPS) for Medicare reimbursement (42 USC § 1395ww [former (d)], as added by Pub L 98-21, 97 US Stat 65), with the rate of payment set according to which regionally fixed "diagnosis related group" (DRG) a given patient fell within (DRG basically describes the patient's primary, diagnosed malady upon admission) (42 USC § 1395ww [d] [1] [former (A)]; [2] [G]; *see, Samaritan Health Center v Heckler,* 636 F Supp 503, 508). Similar to the New York system, under the Federal PPS, a hospital's Medicare reimbursement for a given patient is paid without reference to his actual length of stay or cost actually incurred in rendering services. A hospital experiences a loss or a profit in caring for the patient depending on whether its actual costs are more or less than the established DRG rate. Thus, the Federal PPS provides a similar compulsion and incentive for hospital efficiency.

The Federal PPS/DRG Medicare program was not initially implemented in New York, however. In 1982, this State made major changes in its prospective reimbursement system, called the New York Prospective Hospital Reimbursement Methodology (NYPHRM) (Public Health Law former § 2807-a, as added by L 1982, ch 536, renum § 2808-c by L 1985, ch 807), which included the concept of a "revenue cap", establishing an overall maximum amount of operating revenue reasonably required by an efficiently run hospital for a given period of time. Implementation of NYPHRM required State control over the reimbursement rates of all three major payors. Therefore, the State sought and successfully obtained a three-year (1983-

1985) waiver of the Federal Medicare payment system, as authorized by Federal law (42 USC § 1395b-1 [b]; *see also,* 42 USC § 1395ww [former (c)]).

Of particular relevance to the instant case, NYPHRM addressed the financial problem of the uneven burden of the hospitals' services to indigent patients whose costs of care were not covered by the three major payors. It was estimated that BDCC losses State-wide averaged 5% of hospital "patient days of care". Under NYPHRM, the State added a factor to the rate of each major payor, including Medicare, for BDCC, which went into regional pools for distribution equitably to hospitals experiencing relatively heavier BDCC deficits because of the special characteristics of their patient population and the communities they served.

Subsequently, it was determined that under the new Federal PPS/DRG rate system, aggregate Medicare reimbursement revenues to hospitals in this State would be an estimated $150 million higher than would be recoverable under NYPHRM. Accordingly, and upon the urging of the Hospital Association of New York State, the State did not seek to extend the Federal waiver which was to expire at the end of 1985. The resultant loss of State control over Medicare rate-setting required changes in over-all reimbursement methodology. Therefore, NYPHRM was replaced by a new system (NYPHRM II) *(see,* L 1985, ch 807). In order to continue the BDCC pools, NYPHRM II imposed an assessment of 4.5% on the hospitals' Blue Cross and Medicaid revenues (Public Health Law § 2807-a [former (8)] [e]), but this was offset by a corresponding increase in rates of reimbursement from those payors. The expected shortfall in funding of the BDCC pools was met by a similar 4.5% assessment against hospital Medicare revenues (Public Health Law § 2807-a [former (9)]). However, since the State could no longer set Medicare rates after the expiration of the Federal waiver, there was no statutory provision for a correlative increase in Medicare reimbursement rates.

It is the foregoing assessment upon a percentage of Medicare revenues, without any compensatory increase in Medicare rates, which plaintiff has attacked in the instant action. Plaintiff's complaint alleged that Public Health Law § 2807-a (former [9]) was constitutionally invalid on the grounds that it discriminated against the Federal Government and those with whom it does business in violation of the Supremacy Clause (US Const, art VI, cl 2), was preempted by the Federal

Medicare legislation and denied plaintiff equal protection (US Const 14th Amend; NY Const, art I, § 11). Special Term, upon cross motions for summary judgment, ruled in favor of plaintiff, declaring Public Health Law § 2807-a (former [9]) unconstitutional because of Federal preemption. Special Term also awarded counsel fees to plaintiff, as the prevailing party in a suit against a State's enforcement of an unconstitutional law (42 USC §§ 1983, 1988). This appeal followed.

■ At the outset, we note that the instant appeal was not rendered moot by the repeal of the challenged subdivision and the substitution of a new method of assessment to fund BDCC pools (Public Health Law § 2807-a [8], [23], as amended by L 1986, ch 272). If for no other reason, the award of counsel fees to plaintiff as the prevailing party in this suit remains contingent on the outcome of this appeal *(see, Wells v Dallas Ind. School Dist.,* 793 F2d 679, 684; *Grano v Barry,* 733 F2d 164, 168, n 2).

■ Turning to the merits, we have concluded that Public Health Law § 2807-a (former [9]) withstands plaintiff's constitutional challenge and that, therefore, reversal of the declaration of its invalidity is required. Special Term based its declaration on a holding that the assessment of 4.5% of plaintiff's Medicare revenues to fund BDCC pools was preempted by the Federal Medicare legislation itself. An act of Congress may be held to have preempted State legislation if (1) the Federal statute does so by its express terms; (2) Congress has fully occupied the field of the subject matter of the State law, either by the comprehensiveness of the Federal legislation or the overwhelming dominance of the Federal interest in the subject matter; or (3) State law actually conflicts with Federal law *(Hillsborough County v Automated Med. Labs.,* 471 US 707, 713).

Plaintiff concedes that the Federal Medicare law (42 USC § 1395 *et seq.)* does not expressly preempt. Similarly, as Special Term correctly held, there is no preemption here by implication of a congressional intent totally to take over the field of regulation of hospital in-patient costs and revenues to the exclusion of State regulation, of which Public Health Law § 2807-a (former [9]) was an integral part. The Federal courts have repeatedly expressed the strongest presumption against preemption by general implication in areas of public health and safety, which are of traditional State concern, and the presumption is only rebuttable by a clear indication of contrary congressional intent *(Hillsborough County v Automated*

*Med. Labs., supra,* at 715-716; *Rice v Santa Fe Elevator Corp.,* 331 US 218, 230). This presumption has been applied with full rigor on the issue of Federal preemption of State regulation of hospital costs *(Massachusetts Med. Socy. v Dukakis,* 815 F2d 790; *Rebaldo v Cuomo,* 749 F2d 133, 138, *cert denied* 472 US 1008). Plaintiff can point to no such clear indication of congressional intent here. Indeed, at least one Federal court has found in the language of the Medicare law itself (42 USC § 1395) an expression of congressional intent *not* to occupy the field *(Massachusetts Med. Socy. v Dukakis, supra).*

Special Term, however, found that an actual conflict existed between Public Health Law § 2807-a (former [9]) and two sections of the Medicare law. The first of these is 42 USC § 1395ww (d) (5) (C) (former [i]). That provision directed the Secretary of Health and Human Services (HHS) to make an upward adjustment in PPS/DRG rates "to take into account the special needs of * * * referral centers * * * and of public or other hospitals that serve a significantly disproportionate number of patients who have low income or are entitled to benefits under part A of this subchapter".* Citing to a 1985 congressional committee report on proposed statutory modifications to this provision, which referred to the higher overhead costs of hospitals serving inordinate numbers of uninsured patients, Special Term inferred that the subclause in question was designed to provide additional Medicare compensation for the very same excessive BDCC losses that New York compensates through the BDCC pools funded by the Medicare revenue assessment under review here. Therefore, Special Term reasoned, the assessment under Public Health Law § 2807-a (former [9]) works a "reallocation of Medicare funds" already distributed by Congress to meet the same needs under the disproportionate share provision of the Medicare legislation (131 Misc 2d 779, 785, *supra).*

We fail to see the conflict identified by Special Term. First, it is by no means clear that the purpose of 42 USC § 1395ww (d) (5) (C) (former [i]) is to financially aid hospitals who experience excessive BDCC losses, i.e., losses from treating patients for whom, because of the patients' indigency and lack of insurance, the hospitals receive *no* compensation. Rather, the legislative history of the Federal disproportionate share

---

* This section was amended in 1986 and a new clause with substantially the same provisions was included (42 USC § 1395ww [d] [5] [F], as added by Pub L 99-272).

provision more strongly indicates congressional recognition that the regular PPS/DRG rates of reimbursement are inadequate realistically to cover the higher direct and indirect costs of treating an indigent (and therefore less healthy) *Medicare eligible* patient population, a group having little, if any, connection with BDCC losses. Thus, the 1983 House Ways and Means Committee report on the PPS/DRG Medicare legislation explains the purposes of 42 USC § 1395ww (d) (5) (C) (former [i]) as follows: "Concern has been expressed that public hospitals and other hospitals that serve such [Medicare and low-income] patients *may be more severely ill than average and that the DRG payment system may not adequately take into account such factors"* (HR Rep [Ways & Means Comm] No. 98-25, Mar. 4, 1983, at 141-142, reprinted in 1983 US Code Cong & Admin News 360-361; emphasis supplied). This conforms to the Federal judicial interpretation of the same subclause *(see, Samaritan Health Center v Heckler,* 636 F Supp 503, 508, *supra).* That the disproportionate share provision addresses a cost problem different from that of the uncompensated hospital costs of treating indigent, uninsured BDCC cases is made even more clear from the House Report on the proposed 1985 amendments to the same subsection, concededly inserted to further implement the purposes of that subclause: "Hospitals that serve a disproportionate share of low-income patients have higher *medicare costs per case"* (HR Rep [Ways & Means Comm] No. 99-241, July 31, 1985, reprinted in 1986 US Code Cong & Admin News 594; emphasis supplied).

Even if the purpose of 42 USC § 1395ww (d) (5) (C) (former [i]) had been the same as New York's BDCC legislation, i.e., to aid hospitals disproportionately treating the truly, medically indigent this alone would not be sufficient to invalidate Public Health Law § 2807-a (former [9]) *(see, Florida Avocado Growers v Paul,* 373 US 132, 142). "The test * * * is whether both [Federal and State] regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives" *(supra,* at 142). The heavy presumption against preemption on the ground of Federal-State law conflict is only overcome "when 'compliance with both federal and state regulations is a physical impossibility' * * * or, when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' " *(Hillsborough County v Automated Med. Labs.,* 471 US 707, 713, *supra).* In our view, plaintiff has clearly failed to demonstrate that the payment by

plaintiff of the assessment herein, imposed in effect as a means of equitably redistributing BDCC losses for the legitimate State objective of enabling and encouraging hospitals to treat the medically indigent, either rendered plaintiff's compliance with Medicare a physical impossibility or obstructed in any significant way a congressional purpose to enhance Medicare rates for hospitals disproportionately treating low-income patients. Consistent with the congressional purpose, New York hospitals who disproportionately treat impoverished, uninsured patients are encouraged, not discouraged, to do so by the funding of BDCC pools effectuated through the instant assessment on Medicare revenues. Indisputably, all hospitals in New York are required by State regulation to accept Medicare-eligible patients, and the PPS/DRG Medicare rates of reimbursement are not themselves affected in the least by Public Health Law § 2807-a (former [9]). The assessment is not confiscatory, and the uncontested facts show that the hospitals as a class have a capacity to pay the assessment through increased Medicare revenues resulting from the State's adoption of NYPHRM II following the expiration of the prior Federal waiver. Thus, the assessment of 4.5% of Medicare revenues cannot conceivably stand as an obstacle to the purposes of Medicare, unless it can be clearly shown that, among those purposes, Congress intended that Medicare revenues, once received by hospitals, were to be entirely immune from State taxation or regulation. Suffice it to say, plaintiff has not cited any legislative history whatsoever showing that Congress had such a purpose in mind (cf., Lawrence County v Lead-Deadwood School Dist., 469 US 256, 262-268). The mere creation of an entitlement to receive a certain level of Medicare revenues does not alone evidence a congressional purpose to give health care provider-recipients thereof total immunity from State taxation or regulation affecting such revenues (see, Massachusetts Med. Socy. v Dukakis, supra).

Alternatively, Special Term ruled that the State's assessment of a percentage of plaintiff's Medicare revenues conflicted with 42 USC § 1395x (v) (1) (A) of the Medicare program. In substance, this provision directs Medicare reimbursement on the basis of the reasonable costs of health services, excluding costs incurred which are found to be unnecessary to the efficient delivery of such services, all in accordance with HHS regulations as to rates, costs, types of service and classes of providers. The same clause further provides that the regulations are to take into account: "both direct and indirect costs

of providers of services * * * in order that * * * the necessary costs of * * * services to individuals covered by [Medicare] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by [Medicare]" (42 USC § 1395x [v] [1] [A] [i]). This has been construed by both HHS and Federal court decisions to bar "cross-subsidization" as between Medicare recoverable direct and indirect costs and such costs of the same or similar services to non-Medicare patients (see, 42 CFR former 405.420 [d]; *St. James Hosp. v Heckler,* 579 F Supp 757, *affd* 760 F2d 1460, *cert denied* 474 US 902; *Abington Mem. Hosp. v Heckler,* 576 F Supp 1081, *affd* 750 F2d 242, *cert denied* 474 US 863).

Special Term found that Public Health Law § 2807-a (former [9]) violated the Federal principle against cross-subsidization in that it taxed plaintiff's Medicare revenues for the purpose of subsidizing the care of non-Medicare, medically indigent patients through the BDCC pools. Again, we disagree. As the cited Federal regulation and Federal cases clearly indicate, the cross-subsidization prohibited by 42 USC § 1395x (v) (1) (A) refers to the allowance or disallowance of recoverable costs in the reimbursement rate-setting methodology of HHS. It has nothing whatsoever to do with the hospitals' disposition of Medicare revenues once received, or with a State's nonconfiscatory taxation or regulation of the use of such revenues in the hands of a recipient hospital. Under Special Term's interpretation of the statutory bar to cross-subsidization, a violation would almost inevitably occur in the case of any hospital receiving revenues from Medicare and non-Medicare sources when rates of reimbursement are set in whole or in part prospectively rather than retrospectively based upon actual costs.

To illustrate, plaintiff's PPS/DRG reimbursement rates for its services to Medicare patients are set uniformly and totally without reference to plaintiff's particular, actual costs in treating such patients. Undoubtedly, its Medicare revenues once received are commingled with revenues from other payors, the reimbursement rates for which are also set prospectively, but by State regulatory agencies. The aggregate revenues are used by plaintiff to meet all of its operating expenses. To the extent that plaintiff's PPS/DRG revenues are less than its actual direct and indirect costs attributable to serving Medicare patients, non-Medicare revenues will, in the same sense of the concept employed by Special Term, cross-subsidize

the cost of treating Medicare patients. Conversely, if plaintiff's PPS/DRG receipts exceed its actual cost of care for Medicare-eligible patients, thus giving plaintiff a Medicare profit, that profit will be applied to plaintiff's operating costs for non-Medicare covered treatment. The same would hold true when reimbursement by other primary payors under the State's prospective rate-setting system fails to meet, or exceeds, plaintiff's actual costs for treating the patient population covered by those payors. Since Congress clearly envisaged the continued existence of the present system of dual Federal and State hospital cost containment regulation through differing prospective rate-setting methodologies, it is simply not inferable that the Federal statutory prohibition against cross-subsidization of recoverable costs was intended to limit what a hospital may do with its revenues from any source, or to prevent a State from taxing or regulating a hospital's use of such revenues. We note that the Connecticut Supreme Court has arrived at the same conclusion in rejecting an objection as to cross-subsidization similar to that urged by plaintiff here (see, *Griffin Hosp. v Commission on Hosps. & Health Care,* 200 Conn 489, 512 A2d 199, 204, *appeal dismissed* — US —, 107 S Ct 781).

The remaining grounds alleged in plaintiff's complaint for invalidating the assessment against its Medicare revenues do not require an equally extended discussion. The assessment did not violate equal protection. The United States Supreme Court has held that "[t]he States have a very wide discretion in the laying of their taxes * * * The State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products" *(Allied Stores of Ohio v Bowers,* 358 US 522, 526-527). It is only when a different tax treatment is shown to amount to "invidious discrimination" or is " 'palpably arbitrary' or 'invidious' " that it infringes the equal protection clause *(Lehnhausen v Lake Shore Auto Parts Co.,* 410 US 356, 359-360, quoting *Allied Stores of Ohio v Bowers, supra,* at 530). The tax is presumed to be constitutional and the burden is on the challenger to negate every conceivable rational basis to support it *(Lehnhausen v Lake Shore Auto Parts Co., supra,* at 364; *Madden v Kentucky,* 309 US 83, 88). The legislative history and valid State objective in funding BDCC losses, as previously described, amply afford a rational basis for the distinctions in the assessment of hospital revenues to which plaintiff's objection is addressed.

Likewise, Public Health Law § 2807-a (former [9]) does not run afoul of the Supremacy Clause (US Const, art VI, cl [2]) as a discriminatory tax against the United States or those with whom it does business. The assessment did not fall directly upon the Federal Medicare program; indeed, it did not affect plaintiff's Medicare reimbursement rates in the slightest *(see, United States v New Mexico, 455 US 720, 735)*. Medicare, as the Federal source of reimbursement for hospital in-patient services, was clearly not itself discriminated against under NYPHRM II in comparison with the statutory treatment of other major sources of reimbursement for such services. In point of fact, it is the other major payors, Blue Cross and Medicaid, who received *less* favored treatment than Medicare under the statutory scheme, since the rates of reimbursement they were required to pay hospitals were increased while Medicare rates remained unchanged.

Nor did Public Health Law § 2807-a (former [9]) discriminate against persons with whom the United States does business in its Medicare program, merely because the assessments on hospital Blue Cross and Medicaid revenues were ameliorated by statutory increases in rates of reimbursement from those payors, whereas the State did not (and could not) provide for a compensatory increase in Medicare rates. The Supremacy Clause prohibits discrimination against *persons* dealing with the Federal Government, not kinds of revenues. "[A] State may not single out *those* who deal with the Government, in one capacity or another, for a tax burden not imposed on *others similarly situated* * * * First, it is necessary to determine how *other taxpayers* similarly situated are treated" *(Phillips Co. v Dumas School Dist., 361 US 376, 383*; emphasis supplied). Although it may well be that Public Health Law § 2807-a (former [9]) treated Medicare revenues differently than other hospital revenues, plaintiff has not pointed to any similarly situated persons or entities (taxpayers or otherwise) who received more favorable treatment as a result of the assessment. The statutory class of "taxpayers similarly situated" consists of the voluntary nonprofit hospitals of the State, such as plaintiff, and other, private proprietary hospitals. Plaintiff concedes that acceptance of Medicare patients, hence participation in the Medicare program and the consequential receipt of Medicare revenues, is mandated by the State for *all* hospitals such as plaintiff *(see, 10 NYCRR 405.22 [a])*. All such hospitals are assessed on all of their revenues, from all sources, in an equal manner. Thus, the

statutory distinction in treatment of Medicare and non-Medicare revenues for all hospitals under Public Health Law § 2807-a (former [9]), the sole factor relied upon by plaintiff on this issue, does not establish a tax discrimination violative of the Supremacy Clause.

Finally, plaintiff urges that Public Health Law § 2807-a (former [9]) denies it substantive due process. Although it is highly questionable whether this objection was adequately raised in plaintiff's complaint, we would find in any event that this nonconfiscatory, prospectively applied assessment on Medicare revenues, imposed as a means of equitably redistributing the BDCC losses experienced by the hospital industry as a whole, is rationally related to the legitimate State objective of encouraging and enabling hospitals to serve the State's medically indigent population and, hence, does not offend the Due Process Clause (see, Usery v Turner Elkhorn Min. Co., 428 US 1, 15, 18-20).

For all the foregoing reasons, Special Term's declaration of the invalidity of Public Health Law § 2807 (former [9]) and award of counsel fees to plaintiff should be reversed, and summary judgment should be granted dismissing the complaint.

MAIN, J. P., CASEY, MIKOLL and YESAWICH, JR., JJ., concur.

Order and judgment reversed, on the law, without costs, defendant's cross motion for summary judgment granted and it is declared that Public Health Law § 2807 (former [9]) (as added by L 1985, ch 807 § 4) is valid and has not been shown to be unconstitutional.